SEVELOFF (UNITED STATES v.). See Case No. 16,252.

SEVEN BARRELS DISTILLED OIL (UNITED STATES v.). See Case No. 16,-253.

## Case No. 12,677.

### SEVEN COAL BARGES.

[2 Biss. 297;[1] 3 Am. Law T. Rep. U. S. Cts. 109; 2 Chi. Leg. News, 277.]

Circuit Court, D. Indiana. May, 1870.

ADMIRALTY—JURISDICTION—NAVIGABLE RIVERS—SALVAGE SERVICE—WHAT CONSTITUTES—BARGES.

1. Under the decisions of the supreme court the admiralty jurisdiction of the district courts over all the navigable waters of the country must be considered as established.

2. Salvage being a branch of admiralty jurisdiction, the district court has the same jurisdiction over a case of salvage on the Ohio river as on the Hudson.

  [Cited in Salvor Wrecking Co. v. Sectional Dock Co., Case No. 12,273.]

3. It is sufficient that the property be exposed to a chance which might destroy it, and that the labor, at some personal risk, substantially contributes to the salvage.

4. The fact that the owner is in pursuit, unknown to the salvor, does not deprive him of his claim.

5. Barges adrift on the Ohio river are a proper subject of salvage.

  [Cited in Salvor Wrecking Co. v. Sectional Dock Co., Case No. 12,273.]

In admiralty. This was an appeal from a decree of the district court [of the United States for the district of Indiana] dismissing a libel filed by Henry Huber and others for salvage against seven coal barges found adrift on the Ohio river.

C. E. Marsh, for libellants, argued: First. That salvage services were in their nature the same everywhere, and as meritorious when rendered upon a river as on the high seas; and that the decisions of the supreme court of the United States, following the case of The Genesee Chief v. Fitzhugh [12 How. (53 U. S.) 443], establishing the admiralty and maritime jurisdiction of the national courts over the navigable western waters, brought the case within the ordinary

salvage rules. Second. That whether the property saved was at the time derelict or not, is a question that need be considered by the court only as a circumstance to aid in fixing the quantum of salvage. Courts have repeatedly awarded salvage compensation to salvors who have only aided the master and crew while they still remained on the vessel saved, working conjointly with the salvors in saving the vessel. Nor is actual, present, imminent danger, either to the property or salvors, necessary, though it may be considered in fixing the amount of compensation. The James T. Abbott [Case No. 7,202]; The Susan [Id. 13,630]; note to same case; The Phantom, L. R. 1 Adm. & Ecc. 58; The Collier, Id. 83; The Missouri [Case No. 9,654]; The Reward, 1 W. Rob. Adm. 176; The Isabella, 3 Hagg. Adm. 428; Allen v. The Canada [Case No. 219]; Union Towboat Co. v. The Delphos [Id. 14,400]; The H. B. Foster [Id. 6,290]. Third. Barges are the subject of salvage, as well as vessels used in commerce. A Raft of Spars [Id. 11,529]; Raft of Timber, 2 W. Rob. Adm. 251.

A. Dyer and Asa Iglehart, for respondents.

DRUMMOND, Circuit Judge. These seem to be the material facts: The barges, of considerable size and strength, some of them being one hundred and thirty feet long and twenty-three or twenty-four feet wide, bulkheaded at each end, and some of them decked over, and altogether of the value of four thousand dollars, were fastened to the landing at Evansville in this state, on the Ohio river. They were all lashed together, and had been at the landing for some weeks. They were left there by the steamer Robert Fulton, which used them to tow coal into Evansville. Ervin F. Sansom had charge of them as the agent of the Ardlie Coal and Iron Company. They were lying about half a mile below the place where the steamer was moored. On the 15th of September, 1868, the river being high and rising fast, and between five and six o'clock in the afternoon, some drift-wood having gathered around the coal barges, the pressure became so strong that it snapped the rope which held them to the shore, and they, with the drift, were borne by the current down the river. The rope, which was quite long, in breaking, wound around, more or less, the logs of which the drift was in part composed. Two of the libellants, Huber and Sheer, seeing the barges adrift and no one aboard, took a skiff and immediately followed them, with intent to save them. Friedly, the other libellant, soon joined them in another skiff. The drift and barges floated down not far from and along the Indiana shore. It was necessary, in order to stop the barges and tie them to the shore, that they should obtain possession of the rope wound around the logs of the drift-wood. Accordingly, one of the libellants got on the

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

logs, and, jumping from log to log, with some difficulty and risk, succeeded in extricating the rope, and taking advantage of an eddy, two of them going ashore in a skiff with the line, or hawser, fastened it to two trees, and one of them remaining on the barges and gradually checking them with the hawser, succeeded finally in bringing the barges to land. Three of the barges, when they started, were more or less filled with water. They were all tied to the Indiana shore, about three miles below Evansville. By this time it was getting dark. The drift logs, which had caused the barges to break their fastenings, passed by the eddy down the river. Some time after the barges had broken loose, Mr. Sansom was notified of the fact, and gave directions to the captain of the Robert Fulton to secure them, and the latter, with two men, took a skiff from the steamer, and landing to obtain a line, at the spot where the barges had been fastened, proceeded down the river in a skiff after the barges. ·

It is not clear how far down the river the barges were when the captain of the Fulton and his two men started after them in the skiff. It is probable they were a mile or more, as the captain says it was over an hour before he reached them. They arrived at the place where the barges were fastened, and were told by the libellants, who then first saw them, that the barges were all safe. The libellants deny that anything was done by way of assistance by the other three, but the latter all assert that the barges were more safely fastened to the shore by their aid. And this is probably true. After the barges were secured, all six men left them, went out into the river and took passage on board of the steamer Nimrod, then on her way up to Evansville. The libellants seem to have returned to the barges once or twice during the next few days, and claimed possession of them, while the captain of the Robert Fulton declares that he took control of them. A few days after, they were removed by the Robert Fulton, and then the libel was filed claiming salvage.

There is some controversy in the testimony as to whether the libellants incurred any personal danger in their efforts to secure the barges, and whether the latter were subjected to any risk in floating down the river. The weight of the evidence is that there was some danger to the libellants in what they did. The barges could not be said to be derelict, as within a short time after they broke loose the owner sent men to reclaim them. But as it was growing dark, the river was high, no one was on board, and the barges had no lights, it is not certain that those who followed the libellants could immediately have stopped them, and there would have been undoubtedly a certain risk to the barges had they not been taken by the libellants.

There can be no doubt of the jurisdiction of the district court over a case of salvage on the Ohio river. Since the cases of The Genesee Chief v. Fitzhugh, 12 How. [53 U. S.] 443, and The Hine v. Trevor, 4 Wall. [71 U. S.] 555, and particularly the case of The James E. Eagle v. Frazer [8 Wall. (75 U. S.) 15], decided at the last term of the supreme court of the United States, the admiralty jurisdiction of the district court of the United States over all the navigable waters of this country must be considered as established. Salvage is a branch of the admiralty jurisdiction, and the district court would have the same jurisdiction over a case of salvage on the Ohio or the Mississippi river as on the Hudson or the Delaware. McGinnis v. The Pontiac [Case No. 8,801]; Eads v. The H. D. Bacon [Id. 4,232]; Williams v. The Jenny Lind [Id. 17,723].

The only question therefore in this case is, whether the acts done by the libellants, constituted a salvage service. The elements to make a case of salvage are, enterprise and daring, involving some personal risk, the danger of destruction or loss or injury to the property, labor and skill shown, and the time occupied, the value of the property, and the success of the effort by rescuing the same. It is not necessary that the risk or danger should be absolute; it is enough that at the time, the property is exposed to a chance which might destroy it. Neither is it necessary that the result should be brought about solely by the claimant of salvage; it is enough if his acts in this particular substantially contribute to the salvage even when others assist. 2 Pars. Shipp. & Adm. 282–292, and authorities there cited.

Tested by some of these rules, this was a case of salvage. The barges were afloat on the river with no one on them. It was true they had broken from their moorings, and some one acting for the owner might follow them—how soon was unknown. The current was rapid, the river high, night was approaching, the property was valuable, there was a possibility it might be lost or seriously damaged, there was some personal hazard to the libellants, and the acts of the libellants essentially contributed to save it from loss. If they had seen the owner in pursuit, or known that it would be immediately made, and merely sought to anticipate him with a view of exacting a large compensation for the service; then there might be good reason for saying it was not a case of salvage. But if it was understood that the fact that at the time of rescue the owner was in pursuit of his property floating down the river, deprived the party of the right to a liberal compensation by way of salvage, it would greatly tend to discourage efforts in that direction. The very object of the law of salvage is to promote commerce and trade, and the general interests of the country, by preventing the destruction of property, and to accomplish this by appealing to the personal interests of the individual as a motive of ac-

tion, with the assurance that he will not depend upon the owner of the property he saves for the measure of his compensation, but to a court of admiralty, governed by principles of equity. In this case the libellants appear to have acted in entire good faith. They, at the time, knew nothing of the attempt of the captain of the Fulton to save the barges. They acted promptly and efficiently, and are entitled to a reasonable reward. The claimant tendered each of the libellants five dollars, and paid that sum into court.

Is this adequate compensation under the circumstances? There seems to be no established criterion in estimating the amount of compensation to be given in salvage cases. It depends very much in each case upon the view the court may take of the facts. The hazard run by the salvors, the peril to the property, its value, the extent of labor, the enterprise, skill, energy and daring exhibited in the rescue, and the number of salvors, all enter more or less into the consideration of the question, and determine whether the compensation shall be a mere quantum meruit for work done and time spent, or one-half, or even more, of the value of the property saved.

In this case the property was afloat on a river, not on the ocean; it was not, therefore, exposed to the same danger as if it had been on or near the open sea. The personal risk was not very great, nor the labor long or arduous, and, therefore, a large remuneration should not be given. But the value of the property the libellants helped to save was considerable, and while I wish to do nothing in the administration of the law of salvage to excite unreasonable expectations on the part of those who may save property from peril on the water, I am constrained to say, that if in such cases more liberality were sometimes exhibited by the owner, many cases might be settled by the parties which otherwise reach the courts.

I shall allow the libellants, as salvage, the sum of two hundred dollars, to be equally divided among them.

The decree of the district court is, therefore, reversed, and a decree will be entered in this court in favor of each of the libellants for one-third of the whole sum awarded as salvage, together with costs.

It is proper to add that although my Brother DAVIS did not hear the argument in this case, he has been consulted in relation to it, and concurs in this opinion.

SEVEN COAL BARGES (HUBER v.). See Case No. 12,677.

SEVEN LARGE FERMENTING TUBS (UNITED STATES v.). See Case No. 16,-254.

SEVENTEEN EMPTY BARRELS (UNITED STATES v.). See Case No. 16,255.

SEVENTEEN PACKAGES, ETC. (UNITED STATES v.). See Case No. 16,256.

SEVEN THOUSAND EIGHT HUNDRED BUSHELS OF OATS (CHUBB v.). See Case No. 2,709.