VINCO ENTERPRISES, LTD., Plaintiff,

v.

**NEW YORK DOCK RAILWAY, Defendant.**

No. 78 C 204.

United States District Court, E. D. New York.

June 1, 1982.

Charles A. Nolan, Jr., P.C., Staten Island, N.Y., for plaintiff.

Bigham, Englar, Jones & Houston by George R. Daly, Lawrence B. Brennan, New York City, for defendant.

## MEMORANDUM AND ORDER

SIFTON, District Judge.

This is an action within the admiralty and maritime jurisdiction of this Court, 28 U.S.C. § 1333, seeking to recover salvage with respect to services alleged to have been rendered by plaintiff to defendant's carfloat in the early afternoon of October 28, 1976, in the navigable waters off Pier Nos. 2 through 4 within the jurisdiction of the United States District Court for the Eastern District of New York, 28 U.S.C. § 112(b) and (c). Trial of the case occurred before the undersigned, sitting without a jury, on April 5, 1982. What follows sets forth this Court's findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

In the early afternoon of October 28, 1976, a carfloat, designated NYDR 16, owned by the defendant, New York Dock Railway, broke away from Pier No. 4 on the East River in Brooklyn where it was in the process of being loaded at defendant's terminal at that location. On the carfloat were eight railroad cars having a total value of approximately $235,000, themselves

laden with freight having an aggregate value of approximately $75,000. The carfloat itself—a steel vessel built in 1957, without means of self-propulsion, approximately 290 feet by 40 feet, with the capacity for carrying railroad cars on three tracks—had a value at the time of approximately $140,000.

After breaking loose, the carfloat drifted to approximately mid-channel in the East River, leaving behind at least two railroad cars in the water at Pier 4. Of the eight cars remaining on the carfloat, six were on a single track on the portside. Two were on another track on the starboard side of the vessel, resulting in an appreciable list to port. One of the two cars on the starboard side had, moreover, run off the tracks at the stern and was hanging over the stem of the carfloat.

It was in this condition that the carfloat was first observed by Vincent Healy, the Master of The Sea Traveler, a tug powered by an 800 horsepower engine. The tug was constructed of steel in 1954, was approximately 68 feet in length with a 19-foot beam, and was owned by plaintiff, Vinco Enterprises, Ltd. At the time The Sea Traveler first observed the NYDR 16, the tug was about one-half to three-quarters of a mile northeast of the carfloat and was, itself, just passing under the Brooklyn Bridge. The tug was in the process of towing a steel barge, BG–132, owned by a corporation related to plaintiff, from Newtown Creek on the East River to the Exxon Terminal at Bayonne, New Jersey. (Both corporations were wholly owned by Healy, the Master of The Sea Traveler.) The barge was licensed and used to carry fuel oil, which is characterized as a hazardous cargo in her certificates, and was 120 feet in length with a 32-foot beam. The barge had a capacity for carrying in excess of 200,000 barrels of oil or kerosene and was

without means of self-propulsion. The barge was being towed on the tug's portside and was "light" or empty of fuel oil at the time. In that condition, the barge presented a continuing hazard because of the danger of ignition to a flammable mixture of fuel and air in her hold. The value of the tug, The Sea Traveler, at the time was approximately $150,000. The value of the barge was in the neighborhood of $60,000. In addition to the Master, the tug was manned by two deck hands.

The charter hire for The Sea Traveler was, in 1976, $1,350 for 12 hours. The daily payroll for the crew of two men was $125. During the preceding three-week period, the tug was only active on seven days, and during that period it appears from its log to have been engaged in approximately five short tows of barges in New York Harbor. The figures for charter of The Sea Traveler appear, moreover, to be roughly comparable to the evidence concerning hourly towing rates charged by two other tug boat companies for towing services in the harbor.[1]

When he first observed the carfloat, Healy was uncertain whether it was in tow because his view of the carfloat's far side was obscured by the cars on the float. As the carfloat swung in the flood tide, which was carrying the carfloat towards The Sea Traveler, Healy perceived that the carfloat was not under tow. At the same time, he became aware of a crewman on the carfloat signalling him with his arms in apparent distress. Although no other vessels were to be observed in the area, Healy responded to this situation by using an emergency channel to alert the Coast Guard and other vessels that there was a loose carfloat in midstream in the East River, which constituted a menace to navigation. He received no response to this emergency call.

The menace to navigation which Healy foresaw resulted from the fact that the

---

1. I do not mean by referring to towing rates to suggest a rule entitling a salvor in plaintiff's situation merely to a multiple of towage rates without account given for the peculiar circumstances of each case. See *Mississippi Valley Barge Line Company v. Indian Towing Company, Inc.*, 232 F.2d 750 (5th Cir. 1956). Nevertheless, the fee paid for an ordinary day's work is of obvious pertinence to an inquiry as to what economic considerations operate in deterring and encouraging salvors to leave their ordinary tasks, as here, to perform an act of salvage.

carfloat was being carried by a tidal current of between 1 and 2 knots towards the Brooklyn Bridge. At the Brooklyn Bridge the East River turns from an approximately northeasterly direction to almost due east. It continues in that direction approximately one nautical mile to Wallabout Bay, the site of the Brooklyn Navy Yard, where the stream does an almost right angle turn at Corlears Hook before passing under the Williamsburg Bridge. Because of the "s" curve in the river and its relatively narrow width in this area (approximately ⅓ nautical mile), vessels proceeding in a southwesterly direction on the East River at Corlears Hook have a blind turn onto the lower stretch of the East River.

Healy's next step was to sound his general alarm bell to alert his two-man crew to the situation. After stationing one crew member forward and one aft, he executed a 180° turn in order to maneuver the starboard side of The Sea Traveler (the portside being encumbered with the oil barge) into a position alongside the free-floating tank car. In doing so, Healy successfully avoided the hazards of an excessively hard contact between the tug and the carfloat or between the oil barge and the carfloat. Healy testified that he was concerned that too rough a contact between The Sea Traveler and the carfloat would cause the carfloat to lose the hanging car, with the potential result that the carfloat would capsize. In addition, Healy testified that he was concerned that contact between the carfloat and the oil barge might cause a rupture of the oil barge's hold, creating the possibility of ignition to the flammable fuel/air mixture in the empty tanks. Healy was also concerned to prevent the deck hand on the carfloat from being lost through a premature effort to jump to safety from the carfloat to the tug. To avoid this hazard, he instructed his crew to tell the deck hand on the carfloat to remain where he was until the tug was secured to the bits on the carfloat.

Having accomplished these maneuvers successfully and having secured the carfloat to The Sea Traveler's starboard side, Healy then towed the carfloat to the nearest pier, Pier No. 2. Although defendant suggests that plaintiff should have towed the carfloat to Pier No. 4, from which she had broken loose, the course followed by Captain Healy was the more prudent one, given the fact that he was towing a carfloat, customarily handled by tugs that are powered by 2,000 horsepower engines, that he was encumbered with an oil barge containing a flammable mixture on his portside, and that the stability of the carfloat in its then condition was unpredictable, at least by Captain Healy. At Pier No. 2, Healy and his crew, after themselves going onto the carfloat to secure it to the pier, attempted to secure the hanging railroad car to the float by means of a bridle. The entire salvage operation, from initial sighting to securing the carfloat, took between 30 and 45 minutes. Shortly after the carfloat was secured at Pier No. 2, a second tug, The Brooklyn, belonging to defendant, appeared on the scene and moved the float from Pier No. 2 to Pier No. 4. Defendant argues, based on the log of The Brooklyn, which shows a 20-minute trip from The Brooklyn's last berth to Pier No. 2, that the rescue operation took less than 30 minutes. This argument assumes, however, that the Brooklyn was alerted to the carfloat's plight immediately after it broke loose and responded to the alert as soon as the message instructing it to do so was received. There is no evidence to support this, and I find it improbable that the operation described by Captain Healy took less than a half-hour from start to finish.

## DISCUSSION

■ The elements of a claim for salvage have been articulated recently by Judge Weinfeld in *Markakis v. S/S Voléndam*, 486 F.Supp. 1103, 1106 (S.D.N.Y.1980):

"In order to prevail upon a claim for a salvage award, the plaintiff must prove three essential elements: '1. A marine peril. 2. Service voluntarily rendered when not required as an existing duty or from a special contract. 3. Success in whole or in part, or that the service rendered contributed to such success.'

[Quoting from *The Sabrine,* 101 U.S. 384, 25 L.Ed. 982 (1879) ]"

■ There appears no real dispute between the parties as to any of these elements. In all events, I find that a marine peril existed. The possibility of destruction of the carfloat was to be reasonably apprehended as a result of the vessel's list, the precarious position of the hanging railway car, and the possibility that loss of the hanging car (which remained coupled to the other car on the starboard track) could result in the carfloat's capsizing.[2] In addition, the possibility of collision existed in the heavily trafficked East River between a vessel heading downstream at Corlears Hook and the drifting carfloat being carried toward Corlears Hook by a tidal current.

With respect to the second element, it is clear that The Sea Traveler was under no obligation whatsoever to the carfloat.[3] Nor can there be any question on this record that the salvage operation was successful. Accordingly, I turn to the question of the amount of the award.

■ The factors to be considered in determining the amount of the salvage award are those articulated in *The Blackwall,* 77 U.S. (10 Wall.) 1, 14, 19 L.Ed. 870 (1869). They include:

"1. The labor expended by the salvors in rendering the salvage service. 2. The promptitude, skill, and energy displayed in rendering the service and saving the property. 3. The value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed. 4. The risk incurred by the salvors in securing the property from the impending peril. 5. The value of the property saved. 6. The degree of danger from which the property was rescued." *Id.*

Taking up these factors in order, it is clear that the labor expended by the salvors in rendering the salvage services was not great. The time taken in the salvage operation was of the order of ½ hour and required only a minor diversion from the tug's normal course.

While the energy displayed in rendering the salvage service does not appear extraordinary, the evaluation of the peril and decision to respond appear to have been made almost instantaneously by Captain Healy. Moreover, the skill displayed by Captain Healy in picking up the floating carfloat on the tug's portside without dislodging the hanging railroad car or puncturing his own oil barge appears commendable.

The value of the property employed by the salvor in the operation has already been noted, along with the danger of puncturing the oil barge to which that property was exposed, had Captain Healy not handled the operation with the skill he did. At the same time, it is apparent that Healy's skill to a substantial degree offset the danger of explosion.

■ The value of the property saved has also already been stated. Defendant takes the position that the award should not take into account the value of the railroad cars and their freight, or that, if it does take

2. Healy testified that, as he maneuvered the carfloat towards Pier No. 2, he could hear the hanging car grinding on the carfloat, indicating that it had not come to rest. In addition he testified that the car appeared to be hanging at about its balance point. While photographs of the float do not demonstrate this precarious position unequivocally, the perspective they offer is not clear and certainly the peril referred to was one "reasonably to be apprehended." *Fort Myers Shell & Dredging Co. v. Barge NBC 512,* 404 F.2d 137, 139 (5th Cir. 1968).

3. Defendants suggests that custom in New York Harbor dictated that The Sea Traveler take the carfloat in tow at normal towing rates. The only evidence of this custom was a bill of Moran Towing & Transportation Co. rendered in August 1976 to New York Dock Railway apparently for a tow of one of defendant's vessels which was adrift off the Bush Terminal to Pier 5 pursuant to orders issued by the Coast Guard. This evidence is, moreover, hardly consistent with the long list of successful salvage suits prosecuted by tug boat owners in New York Harbor, 3A *Benedict on Admiralty,* 7th ed. Appendix D. Nor is proof of such a custom sufficient under the case law to transform a salvage claim into one for towage or *quantum meruit. See, e.g., Sears v. S.S. American Producers,* 1972 A.M.C. 1647 (D.Cal.1972); *Benedict, supra* at § 87A

into account the value of the cargo, defendant should be liable only for its proportionate share of the total award. Even if the rule of several liability between the owner of the vessel and the owner of the cargo is the correct one,[4] in the circumstances of this case, in which, in the absence of some other explanation, the peril appears to have arisen as a result of misconduct by the vessel, it appears appropriate not only to include the value of the cargo as a factor to be considered in determining a just award, *see, e.g., Burke v. United States*, 96 F.Supp. 335 (S.D.N.Y.1951), but also to impose liability for that award entirely on the vessel owner without deduction for the cargo's proportionate share. *See The Loyal*, 204 F. 930 (2d Cir. 1913); *The Lackawanna*, 220 F. 1000 (W.D.N.Y.1915); *Cerro Sales Corporation v. Atlantic Marine Enterprises, Inc.*, 403 F.Supp. 562 (S.D.N.Y.1975).

 Finally, the degree of danger from which the carfloat was rescued remains to be considered. While that danger was not negligible, it was also not great. To be sure a risk that the carfloat would be struck by a vessel coming downstream at Corlears Hook existed. Nevertheless, it is also "[a] well recognized rule" which grants "a salvage award in a lesser amount when the service takes place in a harbor where help—particularly tow-boats—is plentiful." *Benedict, supra* at § 252, citing cases. In fact, as noted, help was on the way when assistance was rendered by The Sea Traveler, and there is no testimony that any large vessels in fact passed downstream during the salvage operations which would have had to avoid or collide with the loose carfloat.

Having taken these factors into account, I bear in mind that they have been characterized as "a category of reasons for giving much or little." *Canadian Government Merchant Marine, Ltd. v. United States*, 7 F.2d 69, 70 (2d Cir. 1925). In the circumstances here presented, it is perhaps best to consider as well the purposes of the award, which have been characterized in part as

follows: "The problem usually is not to award so little as to discourage salvage aid, nor so much as to encourage unnecessary or exaggerated service." *The No. 92*, 252 F. 117 (2d Cir. 1918), quoted in *Benedict, supra* at § 241.

 Taking into account all of the above as well as the relation of awards to values of property salved and hazarded set forth in other comparable New York Harbor cases in the past, I have determined that a salvage award of $8,500 appears just.

The Clerk is directed to enter judgment in favor of plaintiff and against the defendant in the amount of $8,500 plus interest at the rate allowed by state law from the date of judgment and to mail a copy of this decision and order to counsel for both sides.

SO ORDERED.

---

**4.** *But see Benedict, supra* at § 207:
"It appears that the better rule would be one permitting the salvor to look to the vessel for his reward where the services have been simultaneously rendered to the vessel and cargo."