The UNNAMED BUT IDENTIFIABLE MASTER AND CREW OF THAT CERTAIN UNITED STATES DOCUMENTED VESSEL BEARING DOCUMENTATION NO. 567135, Plaintiff,

v.

That CERTAIN UNNAMED MOTOR VESSEL BEARING FLORIDA REGISTRATION NO. FL5607 EM, in rem, etc., et al, Defendant.

UNITED STATES of America, Plaintiff/Counter Defendant,

v.

ONE 38′ SCORPION OCEAN RACER, FL #5607 EM, with its equipment, Defendant,

The Unnamed But Identifiable Master and Crew of That Certain United States Documented Vessel Bearing Documentation No. 567135, Counterplaintiff/Counter-Salvors.

Nos. 83–2462 CIV–LCN, 84–0103 CIV–LCN.

United States District Court, S.D. Florida, Civil Division.

Aug. 28, 1984.

J. James Donnellan, III, Miami, Fla., for plaintiff.

Jonathan Goodman, Michael W. Burnbaum, Asst. U.S. Attys., Miami, Fla., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

NESBITT, District Judge.

THIS CAUSE came before the Court for a non-jury trial of the above-styled action of June 7, 1984. By Order of this Court dated March 29, 1984, this cause was consolidated with Case Number 84–0103 CIV–LCN. Immediately prior to trial, the claim of the purported owner to the vessel was withdrawn, and a default judgment was entered in favor of the United States in Case Number 84–0103 CIV–LCN. The cause then proceeded to trial only as to Case Number 83–2462 CIV–LCN.

## FINDINGS OF FACT

On July 23, 1983, the Plaintiffs came upon the in rem Defendant vessel, ONE (1)

38′ SCORPION OCEAN RACER FL. #5607 EM, hereinafter "Black Scorpion", in international waters of the Atlantic Ocean, approximately thirty-five (35) miles off the coast of the United States. As the Plaintiffs approached the Defendant in their own vessel, the Dalliance, they witnessed the departure of the crew of the Defendant into a white racing vessel which had been hovering near the Defendant. The white vessel left the general area of Black Scorpion and at all times relevant to this case, persons on the white vessel remained in the vicinity.

After the Plaintiffs moved alongside of the Black Scorpion, they discovered that the engines of the Defendant were running in reverse, leaving her in danger of taking water and sinking. The Plaintiffs then boarded the Black Scorpion, shutting down its engines and attaching tow lines to it. After boarding, the Plaintiffs discovered that the vessel was loaded with a cargo of marijuana in excess of eight thousand (8000) pounds.

Upon discovering the marijuana, Plaintiffs initiated radio contact with the United States Coast Guard, advising the Coast Guard of their situation, and requesting assistance. The Coast Guard was informed by Plaintiffs of their general location, but not of the precise location of the Black Scorpion.

Before the arrival of the Coast Guard cutter, a third vessel, a small motorboat, approached the Defendant, and its occupants came aboard the Defendant and began unloading the bales of marijuana. The Plaintiffs warded off these individuals by brandishing a shotgun and they returned to their motorboat and left the scene.

Upon the arrival of the Coast Guard cutter "Cape Gull", the Plaintiffs turned the Black Scorpion over to the care and custody of the Coast Guard. The Plaintiffs claimed the vessel as a derelict, and, also claimed to be salvors. The Black Scorpion was driven back to the United States by the U.S. Coast Guard.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1333 and Rule 9(h) of the Federal Rules of Civil Procedure.

2. The Plaintiffs have claimed that the Defendant vessel was found and boarded as an abandoned or derelict vessel, and that by boarding the vessel and preparing to tow it, the Plaintiffs have established ownership of the vessel.

■ However, the Court finds that the Defendant vessel was at no time either derelict or abandoned. "Dereliction or renunciation of property requires both the intention to abandon and external action... There must be a voluntary intention to abandon, or evidence from which such intention may be presumed." *The No. 105, Belcher Oil Co. v. Griffin*, 97 F.2d 425, 426 (5th Cir.1938). *See also, Katsaris v. United States*, 684 F.2d 758 (11th Cir.1982), discussing the issue of abandoned property on land, not in an admiralty setting.

In this case, there was no showing whatsoever to support a finding that the initial occupants of the Defendant vessel ever intended to permanently leave the vessel. Rather, the evidence supports the conclusion that these persons simply left the vessel temporarily under the misapprehension of the identity of the Plaintiffs. This finding is supported by both the fact that the original crew at all times remained hovering in view of the Defendant vessel, and also by the fact that certain individuals did actually return to the Defendant vessel, boarding it and attempting to offload its illegal cargo.

3. In the alternative, the Plaintiffs claim that they are entitled to an award in salvage, based on the service they rendered in aiding the Defendant vessel.

■ In determining whether a would-be salvor is entitled to an award under the admiralty law salvage doctrine, the Court must examine three factors. The claimant must prove "maritime peril; service voluntarily rendered, not required by duty or contract; and success in whole or part,

with the service rendered having contributed to success". *B.V. Bureau Wijsmuller v. United States*, 702 F.2d 333, 338 (2d Cir.1983). *Treasure Salvors, Inc. v. The Unidentified, Wrecked and Abandoned Sailing Vessel*, 556 F.Supp. 1319 (S.D.Fla. 1983). As well, the claimant must not have been responsible for causing the condition putting the vessel in peril.

■ In this case, the Government, as the owner of the vessel, has attempted to show that the Plaintiffs were the cause of the vessel being abandoned, such as would prevent the Plaintiffs from recovering as salvors. However, the Court does not find this view of the facts supported by the evidence. Although the crew may have left the Black Scorpion out of a belief that the Plaintiffs were some type of governmental or police officials, the evidence does not show that the Plaintiffs in any way forced the crew out of the vessel. As well, the Court also finds that the vessel was in peril, as it was taking on water and in danger of sinking, and also that the service rendered voluntarily by the Plaintiffs did in fact prevent the vessel from possibly sinking or being apprehended by those persons in the small motorboat.

■ It is important to note that the doctrine of salvage does not require that the salvors act out of any spirit of charity or maritime "social concern". Rather, the purpose of the salvage award is to encourage individuals to render prompt assistance where needed at sea. Gilmore & Black, *The Law of Admiralty*, (2d ed. 1975), § 8–1. Thus, the fact that the Plaintiffs may have been motivated by the opportunity for material gain does not prevent them from receiving an award in salvage, since they have proven the existence of the three salvage conditions: peril, voluntary service, and success. *B.V. Bureau Wijsmuller, supra.*

■ 4. Having determined that the Plaintiffs are entitled to some award for the salvage services rendered, the issue turns to the amount of the award. In computing the award, the Court must review six factors:

(1) the labor expended by the salvors in rendering the salvage service;

(2) the promptitude, skill and energy displayed in rendering the service and saving the property;

(3) the value of the property employed by the salvors in rendering the service and saving the property;

(4) the risk incurred by the salvors in securing the property from the impending peril;

(5) the value of the property saved; and

(6) the degree of danger from which the property was rescued.

*Treasure Salvors, Inc.*, 556 F.Supp. at 1340.

In this case, the review of the evidence indicates that the Plaintiffs incurred little maritime risk in securing the Defendant vessel. The Plaintiffs did not cause any special equipment or extremely valuable vessels to be at risk in the operation, as they utilized only their time and the fishing vessel they were on in rendering the salvage services. The Plaintiffs appeared to do the job effectively, but by their own testimony, the job was not particularly difficult or complex. As for the value of the property saved, the uncontroverted evidence presented at trial was the Defendant vessel had a value of approximately One Hundred Thirty Thousand ($130,000.00) Dollars.

■ Considering the six factors as set out above, as well as the awards granted in other reported salvage decisions; *Reynolds Leasing Corp. v. The Tug Patrice McAllister*, 572 F.Supp. 1131 (S.D.N.Y.1983); *McNabb v. O.S. Bowfin*, 565 F.Supp. 22 (W.D.Wash.1983); *Vinco Enterprises v. New York Dock Railway*, 540 F.Supp. 1183 (E.D.N.Y.1982); the Court determines that the Plaintiffs are entitled to an award of Five Thousand ($5,000.00) Dollars as fair recompense for the salvage services rendered. This judgment is with interest at 4% per annum from the date of the entry of

judgment pursuant to the provisions of 46 U.S.C. § 743.