881 F.2d 107
 Michael Stephen BROWN, t/a Marine Towing and Salvage
Company, Plaintiff-Appellee,
v.
Ronald K. JOHANSEN, on his own behalf and on behalf of his
surety; International Fidelity Insurance Company; One 1986
Model Trojan International 13 Meter Motor Vessel,
Manufacturer's Hull Number TRJKH003E586, bearing the name
Outrageous and Hailing Port Asharoken, New York, her
engines, tackle, electronics, apparel, etc., in rem,
Defendants-Appellants.
 No. 88-2176.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 11, 1989.
Decided June 29, 1989.
Rehearing and Rehearing En Banc Denied July 31, 1989.
 
 A.D. Ward, Sr. (Ward, Ward, Willey & Ward, New Bern, N.C., on brief), for defendants-appellants.
 Stevenson Lee Weeks, Sr. (Wheatly, Wheatly, Nobles & Weeks, P.A., Beaufort, N.C., on brief), for plaintiff-appellee.
 Before WIDENER and SPROUSE, Circuit Judges, and DUPREE, Senior United States District Judge for the Eastern District of North Carolina, sitting by designation.
 PER CURIAM:
 
 
 1
 In this admiralty action Ronald K. Johansen, as owner of the motor yacht, Outrageous, appeals a judgment awarding the plaintiff, Michael Stephen Brown, a marine salvage operator, the sum of $77,050 for services rendered in refloating the yacht after it became beached on the coast of Carteret County, North Carolina in December 1986. With one minor modification we affirm.
 
 
 2
 On December 22, 1986, while en route from New York to Florida the Outrageous became disabled through engine failure off the coast of North Carolina at or near Cape Lookout Shoals. That night the vessel was swept by the winds, waves and currents onto the beach a short distance north of Cape Lookout Point.
 
 
 3
 On the following day the master of the vessel contacted the United States Coast Guard which, after ascertaining that no lives were endangered, contacted the plaintiff, Michael Stephen Brown, t/a Marine Towing and Salvage Company, and informed him that the vessel was aground near Cape Lookout and had requested commercial assistance. Immediately thereafter Brown assembled a crew and salvage equipment and proceeded in his tug, the Shillelagh, to Cape Lookout arriving there at approximately 2:30 p.m. on December 23, 1986. Brown found the Outrageous to be hard aground on the beach with its starboard side broadside to the surf and its bow pointing in a northeasterly direction.
 
 
 4
 Brown and his crew thereupon tried to refloat the beached vessel and were able to attach a tow line to it, but because of the worsening weather they were not successful, and they had to abandon their efforts on that day.
 
 
 5
 Over the next six days Brown and his crew continued their efforts to free the stranded vessel, battling gale force winds and heavy seas continually, and with the use of extra equipment including a bulldozer delivered to the beach by a barge they were finally able to refloat the Outrageous on December 29, 1986. It was then towed to a drydock facility in Carteret County where examination of its hull revealed only moderate damage and following engine repairs the yacht was made ready to proceed on its way.
 
 
 6
 The district court found that the value of the Outrageous in the condition in which it arrived at the drydock was approximately $400,000, all of which was fully saved by reason of the salvage services rendered by Brown. The court also found that in connection with his salvage services Brown incurred out-of-pocket expenses in the amount of $28,215.28 and that he lost or broke equipment at a cost of $1,800.23 in his salvage efforts. With one small exception to be noted later defendant does not question the sufficiency of the evidence to support these findings.
 
 
 7
 The defendant raises two issues on appeal: (1) that the district court erred in concluding that plaintiff's salvage services were not rendered under a special contract with defendant but were voluntarily rendered thus entitling plaintiff to a more liberal award under the laws of salvage; and (2) that the court erred in deciding the case in plaintiff's favor without having read and considered the plaintiff's deposition which was placed in evidence near the conclusion of the trial.
 
 I.
 
 8
 On the morning of December 24, 1986 the plaintiff called the defendant Johansen by telephone at his home in New York. Plaintiff testified that defendant told him at that time to "get the boat off, whatever it takes," and that he understood that to mean that defendant wanted the boat refloated regardless of the expense. Money was not discussed, plaintiff testified, for that the expense and difficulty in performing the work could not be known at that time. Defendant simply promised to pay the plaintiff as soon as the job was completed but never at any time agreed to pay the plaintiff in the event his efforts in refloating the yacht were unsuccessful.
 
 
 9
 A. And the fact that he would pay or not pay for anything was not discussed. I assumed that I had--I was doing a service, and we were more concerned about the weather and doing the service, at this particular time. The wind was blowing 40 knots; we were worried about the boat, and we were not concerned with--however we looked at it in retrospect--with the legal aspects. He wanted his boat off, and I wanted to get his boat off.
 
 
 10
 Q. And you understood he was going to pay you for it?
 
 
 11
 A. I assumed that he was going to pay me for it. I had no written--there was no way of obtaining any documents. We couldn't get telegrams.
 
 
 12
 Q. You weren't doing it for free?
 
 
 13
 A. Of course not.
 
 
 14
 Plaintiff's Deposition pp. 64-65.
 
 
 15
 In a further telephone conversation with defendant on January 4, 1987 plaintiff testified that he gave defendant his total bill in the amount of $83,195 calculated on a cost plus basis in response to which defendant replied, "Well, the job was well done, and I'll come down tomorrow and we'll break bread." Without having heard further from the defendant and fearing that the yacht which had now been repaired would leave the jurisdiction, plaintiff instituted this action on January 8, 1987 and caused the Outrageous to be arrested.
 
 
 16
 The gist of defendant's evidence was that he told the plaintiff to get the boat off the beach and that he would make sure that plaintiff was paid for his services.
 
 
 17
 A. ... But I always let him know that I was more than willing to send in funds if he needed it. His comment to me at each instance was that there was no necessity for any funds right then, that he was not incurring any expenses. He was charging his bills and that when the time came that he needed money he would make sure and tell me.
 
 
 18
 * * *
 
 
 19
 * * *
 
 
 20
 Q. Never at any time did you agree with Mr. Brown that he would [be] paid "X" amount of dollars for this job, did you?
 
 
 21
 * * *
 
 
 22
 * * *
 
 
 23
 A. No, because he said that he wasn't sure what it would involve, and that he would bill me according to the involvement of his people and equipment and everything else, which is what he eventually did. He did submit an itemized bill through the courts.
 
 
 24
 Defendant's Testimony, Appendix pp. 484 and 506.
 
 
 25
 On the question of the voluntary nature of plaintiff's services the evidence was at best conflicting, and the trial court's finding that the services were voluntary and not required as an existing duty or from a special contract when examined in the light of the applicable clearly erroneous standard is not open to question on this appeal. Having made this finding, the law is clear that plaintiff was entitled to compensation under the law of salvage as defined by the Supreme Court in The Sabine, 101 U.S. 384, 25 L.Ed. 982 (1879), where it is said:
 
 
 26
 Salvage is the compensation allowed to persons by whose voluntary assistance a ship at sea or her cargo or both have been saved in whole or in part from impending sea peril, or in recovering such property from actual peril or loss, as in cases of shipwreck, derelict, or recapture.
 
 
 27
 Three elements are necessary to a valid salvage claim: 1. A marine peril; 2. Service voluntarily rendered when not required as an existing duty or from a special contract. 3. Success in whole or in part, or that the service rendered contributed to such success.
 
 
 28
 In The Blackwall, 77 U.S. (10 Wall.) 1, 19 L.Ed. 870 (1870), the Supreme Court set out the factors to be considered in determining a salvage award. The Second Circuit in B.V. Bureau Wijsmuller v. United States, 702 F.2d 333, 339 (2d Cir.1983), has rearranged these factors in descending order of importance as follows: (1) degree of danger from which the property was rescued, (2) value of the property saved; (3) risk incurred in saving the property from the impending peril; (4) promptitude and skill displayed; (5) value of the property employed by the salvors and the danger to which it was exposed; and (6) labor expended in rendering the salvage service. In determining the award in this case the trial court stated that it had considered each of these factors, and our own review of the evidence leads us to conclude that each of the factors was fully satisfied.
 
 II.
 
 29
 The defendant's contention that the trial court decided the case without having read plaintiff's deposition introduced near the close of the trial cannot be sustained. It is true that there was a definite indication by the court during a colloquy at the end of the trial that decision would go in favor of the plaintiff since the court felt that defendant had failed in his duty to establish by a preponderance of the evidence that the services performed by plaintiff had been pursuant to a special contract. However, another day elapsed before the court issued its written opinion, and there is no support in the record for defendant's contention that the judge failed to read the designated portions of plaintiff's deposition before rendering the final decision. Moreover, our own reading of the deposition vis-a-vis plaintiff's trial testimony and that of the defendant leaves us with the impression that the outcome would not have been altered whether or not the deposition was read.
 
 III.
 
 30
 Defendant has raised for the first time in his reply brief the contention that the damages awarded by the trial court were excessive. Whether it was open to defendant to raise this point in his reply brief is questionable, see Mississippi River Corporation v. F.T.C., 454 F.2d 1083 (8th Cir.1972), but be this as it may, under the law of salvage elements of damages not normally considered in contract actions are taken into account in arriving at a proper award.
 
 
 31
 Compensation as salvage is not viewed by the admiralty courts merely as pay on the principle of quantum meruit or as a remuneration pro opere et labore, but as a reward given for perilous services voluntarily rendered, and as an inducement to mariners to embark in such dangerous enterprises to save life and property.
 
 
 32
 The Sabine, supra, 101 U.S. at 384.
 
 
 33
 Thus the trial court here properly took into account the fact that the plaintiff and his crew at considerable risk to themselves and their equipment in an operation extending over a period of six days successfully saved defendant's valuable yacht from sure destruction. While the award may seem at first blush to have been liberal, it was certainly not such as to shock the conscience of the court or to leave us with the clear impression that a mistake has been made.
 
 
 34
 In his initial brief defendant did take issue with one small area of the trial court's calculations. The court found that plaintiff incurred out-of-pocket expenses of $28,215.28 which included $2,100 due one Dick Ogus for salary. Defendant points out that the time sheet as submitted by plaintiff showed that Ogus worked seventeen hours on December 26, 1986, but that Ogus testified he only worked four or five hours on that date and that he was not employed at all on December 27 when plaintiff's time sheet indicates that he worked seventeen hours on that date. This would have reduced plaintiff's claim for wages paid Ogus from $2,100 to $1,340, a difference of $760. Since the evidence does not support the court's finding with respect to this $760, the action will be remanded for the elimination of this sum from the judgment.
 
 
 35
 In summary, the findings of the district court are not clearly erroneous; the record does not support the contention that the district court failed to read the plaintiff's deposition prior to deciding the case; and the claim that the damages awarded were excessive is without merit. For the correction of the minor error noted in the calculation of plaintiff's damages the action is remanded.
 
 
 36
 AFFIRMED AND REMANDED.