**FLAGSHIP MARINE SERVICES, INC., d/b/a Sea Tow Services of Lee County, Plaintiff,**

v.

**BELCHER TOWING COMPANY, Belcher Oil Co., in personam, M/T E.N. BELCHER, JR., her engines, tackle, appurtenances, etc., in rem, BARGE 10, her engines, tackle, appurtenances, etc., in rem, and BARGE 18, her engines, tackle, appurtenances, etc., in rem, Defendants.**

No. 89–1936–CIV.

United States District Court, S.D. Florida.

April 18, 1991.

Michael T. Moore, Barbara E. Locke, Miami, Fla., for plaintiff.

George O. Mitchell, Miami, Fla., for defendants.

## MEMORANDUM OPINION CONTAINING FINDINGS OF FACT AND CONCLUSIONS OF LAW

ARONOVITZ, District Judge.

THIS CAUSE was tried before the Court without a jury on March 27, 28, 29 and April 2, 1991. The Court has carefully considered all of the testimony and exhibits offered by the parties at trial, the proposed findings and conclusions, and memoranda of law submitted by the parties. Having done so, and being otherwise fully advised in the premises, the Court herewith renders this opinion with Findings of Fact and Con-

clusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### Findings of Fact

1. This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure to enforce a maritime lien for services. A Letter of Undertaking in the amount of $100,000.00 was posted by the Defendants in lieu of the arrest of the *in rem* Defendants.

2. This case is within the admiralty and maritime jurisdiction of the Court pursuant to 28 U.S.C. section 1333, and is governed by the principles of general maritime law.

3. Early on the morning of July 17, 1989, the E/N BELCHER, JR., departed the Florida Power & Light dock at Tice, Florida after completing a delivery of oil. The E/N BELCHER, JR. filled its tanks with 11,000 gallons of diesel oil for a return trip to Boca Grande, Florida, via the Okeechobee waterway. Winds were light and inland seas were calm.

The E/N BELCHER, JR. was pushing a tow made up of Barge No. 18 and Barge No. 10. Barge 18 has the capacity to transport net 759 tons of oil. Barge 10 has the capacity to transport net 808 tons of oil. Each barge when full, carries 10,000 barrels of oil, each barrel holding 50 gallons, for a total of 200,000 gallons of oil.

4. At approximately 3:05 a.m. on July 17, 1989, the Captain of the E/N BELCHER, JR., William Diamond, advised the Ft. Myers Beach Coast Guard that the tug had struck an unidentified submerged object in the area of Big Shell Island, and was rapidly taking on water. Big Shell Island is located off of the Southwest Florida coast near Ft. Myers Beach, Florida. The situs of the incident was in an inland waterway consisting of mangroves and small islands.

After receiving Captain Diamond's message the Coast Guard then notified the Ft. Myers Fire Department, the Cape Coral Fire Department, the Cape Coral Police Department, and the Plaintiff, Sea Tow.

5. The E/N BELCHER, JR., then maneuvered the two barges into the shallows

of Big Shell Island, wedging the barges into the trees. At approximately 3:08 a.m. the tug disconnected from the barges, and then under full power the tug was run aground. Captain Diamond purposely tried to get the tug as far up on to the beach as possible to prevent the vessel from sinking.

6. At approximately 3:10 a.m., following the intentional grounding, Captain. Diamond placed a second call to the Coast Guard advising them that the tug was shutting down the engines due to the rapid rise of water in the engine room. The Captain and crew of the E/N BELCHER, JR. then abandoned ship.

7. According to the E/N BELCHER, JR. Official Daily Log (Defendant's Exhibit # 1), the Coast Guard arrived on the scene at approximately 3:30 a.m. and placed their pumps on the port side of the tug. At approximately 4:00 a.m., a Cape Coral Fire Department boat arrived on the scene with two, 200 gallon per minute pumps. Shortly thereafter, a Ft. Myers Fire Department boat arrived with a 200 gallon per minute pump and a 1,000 gallon per minute pump. Also arriving on the scene was a Cape Coral Police Department boat which was not equipped with a pump. The first Sea Tow vessel, the Sea Tow I, arrived at the scene at approximately 4:15 a.m. Sea Tow III arrived on the scene at approximately 4:20 a.m. Eventually a third Sea Tow vessel arrived on the scene. In addition, Sea Tow had up to six pumps on the scene, including two trash pumps.

8. When Sea Tow initially arrived on the scene, Captain Diamond inquired of the Sea Tow representative about charges for Sea Tow's services. The parties did not agree to a price for Sea Tow's services at that time. Captain Diamond accepted Sea Tow's assistance in salving the tug. In fact, Captain Diamond told the Sea Tow representative to do whatever was necessary to save the tug. At no time did Captain Diamond refuse Sea Tow's services or request that Sea Tow leave the scene.

9. Despite the operation of the various pumps, water continued entering the engine room causing the tug to list to port. Initially, the Coast Guard would not authorize a diver to go under the tug and inspect the damage due to fears that the tug would roll over. The depth of the water in the vicinity of the sinking tug varied from seven to seventeen feet.

10. At approximately 5:15 a.m., the tide changed and Barge 10 and Barge 18, which were still tied together, began to drift into the channel propelled by the current. (Plaintiff's Exhibit # 2) Sea Tow I and Sea Tow III, together with several of the smaller public service boats, directed an effort to retrieve the barges and secure them safely to the trees on Big Shell Island. The barges had no lights, and were drifting up the channel posing a very real danger to innocent marine traffic that might have come down the channel. In addition, the barges posed a more imminent danger to vessels that were on the scene trying to rescue the sinking tug. (testimony of Cape Coral Police Officer Todd LaBair) In fact, a Coast Guard vessel on the scene was forced to move for fear of being crushed by the barges. The barges were again secured at 5:45 a.m.

11. Having secured the barges, Sea Tow returned to the tug. Finding that the tug was continuing to list, Sea Tow decided that a diver must patch the hole in the tug. The preferred method for patching a hole is to place a patch on the outside of the vessel. However, due to the continued fear that the E/N BELCHER, JR. would roll over Sea Tow was unable to place a patch on the outside of the vessel.

12. At approximately 6:00 a.m., Captain Don Robinson, a Sea Tow salvor, went down into the engine room of the tug to patch the hole. The conditions that existed in the engine room were hazardous. The water was over eight feet deep. There was gasoline and swirling debris circulating in the water. Fighting against the inflowing water, Captain Robinson was able to plug the hole with material carried on the Sea Tow vessels especially for that purpose. In order to reach the hole, Captain Robinson had to position his body upside down in the eight feet of water inside the tug's engine room. The Court finds that Captain Robinson is an experienced diver and sal-

vor, who carried out this task with skill and professionalism.

13. Captain Robinson completed plugging the hole from the inside of the vessel at 6:45 a.m. This was a temporary measure. Once the water stopped gushing through the hold, the pumps began to gain on the flow and the tug began "righting" itself.

14. At approximately 7:30 a.m. Captain Robinson did an inspection dive on the outside of the tug to determine the extent of damage to the vessel. In addition, Captain Robinson completed plugging the hole in the vessel. Later that day, professional divers hired by Sea Tow installed an exterior patch over the hole by welding metal plates onto the hull of the tug. Sea Tow personnel assisted from the interior of the vessel.

15. At approximately 6:00 p.m. the Sea Tow vessels departed, leaving behind one of their pumps. The Sea Tow III returned to the scene the next day to inspect the patch prior to the E/N BELCHER, JR.'s trip to Tampa.

*Conclusions of Law*
The Salvage Claim

1. On land the person who rushes in to save another's property from danger is an officious intermeddler, the volunteer whom even equity will not aid. He has no right to a reward, although he may incur liability if he damages the property in the course of saving it. The person who saves life on land is similarly treated, except that he may count on a paragraph in a court's opinion paying tribute to his good character. Gilmore & Black, *The Law of Admiralty*, (2d ed. 1975), Section 8–1.

At sea the person who saves property receives a reward which is generously computed in the light of "the fundamental public policy at the basis of awards of salvage—the encouragement of seamen to render prompt service in future emergencies." *Id.* It is important to note that the doctrine of salvage does not require that a salvor act out of a spirit of charity or social concern. Rather, the purpose of the sal-

vage award is to encourage individuals to render prompt assistance to others at sea.

■ Thus, the fact that a salvor is motivated by the opportunity for material gain does not prevent him from receiving an award in salvage, so long as the salvor can establish the conditions of salvage. *Unnamed But Identifiable Master and Crew v. Certain Unnamed Vessel*, 592 F.Supp. 1191 (S.D.Fla.1984).

■ 2. In order for a valid salvage claim to exist, the following elements must be present:

(a) a maritime peril from which the ship or other property could not have been rescued without the salvor's assistance;

(b) a voluntary act by the salvor under no legal or contractual duty to the owner; and

(c) success in saving, or in helping to save at least part of the property at risk.

*Klein v. Unidentified Wrecked and Abandoned Sailing Vessel*, 758 F.2d 1511 (11th Cir.1985).

■ 3. After hearing the testimony of the witnesses and reviewing all of the evidence, this Court finds that the E/N BELCHER, JR. did face a maritime peril during the early morning hours of July 17, 1989. In the opinion of those present on the scene, and in view of the testimony regarding the hole in the hull of the tug and the rapid list to port, the tug was in imminent danger of rolling over and submerging.

Furthermore, at the time BARGE 10 and BARGE 18 broke loose, it was pitch dark. The current swept the barges off the mangroves of Big Shell Island, and swung them into the channel. While the barges themselves were in no dire danger of peril, it is difficult to comprehend how two huge free-floating barges would not present an imminent danger to all lives and vessels caught in their path. Therefore, the Court finds that the barges added to the marine peril at the scene, and should therefore be included in the consideration of a salvage award. *Mississippi Valley Barge Line Co.*

*v. Indian Towing Co., Inc.*, 232 F.2d 750, 755 (5th Cir.1956).

4. It is Sea Tow's customary business practice to monitor the radio twenty-four hours a day in order to be ready to respond quickly to distress calls. There can be no dispute that Sea Tow responded to the scene of E/N BELCHER, JR. mishap voluntarily. Captain Robinson testified that Sea Tow received a call from the Coast Guard to assist in the operation. Thereafter, Sea Tow arrived on the scene.

Furthermore, the conversations that took place between Sea Tow and Captain Diamond did not rise to the level of either a contract between the parties, or a special oral agreement. *Brown v. Johnson*, 881 F.2d 107 (4th Cir.1989).

5. The evidence clearly establishes that Sea Tow was successful in salving the tug and barges. Sea Tow's personnel acted promptly and skillfully in salving the tug. Captain Robinson's dive whereby he plugged the hole in the tug was the turning point in the operation to save the vessel.

6. Based on the foregoing, this Court concludes that Sea Tow has satisfied the elements necessary for a valid salvage claim.

### Computation of Salvage Award

7. Having determined that Sea Tow has a valid salvage claim, the Court must now compute the salvage award. The elements considered by an Admiralty Court in determining a salvage award are:

(a) the labor expended by the salvors in rendering the salvage service;

(b) the promptitude, skill and energy displayed in rendering the service and salving the property;

(c) the value of the property employed by the salvors in rendering the service and saving the property;

(d) the risk incurred by the salvors in securing the property from the impending peril;

(e) the value of the property saved; and

(f) the degree of danger from which the property was rescued.

*Unnamed Master & Crew v. Certain Unnamed Vessel*, 592 F.Supp. 1191, 1194 (S.D.Fla.1984); *Cobb Coin Co., Inc. v. Unidentified, Wrecked, and Abandoned Sailing Vessel*, 549 F.Supp. 540, 557 (S.D.Fla.1982). These six factors are originally derived from Justice Clifford's opinion in *The Blackwall*, 77 U.S. (10 Wall.) 1, 19 L.Ed. 870 (1870).

### Labor Expended by Sea Tow

8. Captain Robinson, a fleet Captain for Sea Tow, prepared an invoice for the salvage services rendered on Belcher's behalf on July 18, 1989. The invoice total was $24,281. While the invoice was never delivered to Belcher, it was admitted into evidence at trial as Defendant's Exhibit # 19. The invoice represents a calculation of what the salvage job would have cost had it been on a straight time and material basis. It does not account for all of the elements of a salvage award.

### Promptitude, Skill and Energy Displayed by Sea Tow

9. At 3:50 a.m. on July 17, 1989 Sea Tow received a call from the Coast Guard regarding the plight of the E/N BELCHER, JR. Sea Tow had two vessels (Sea Tow I and Sea Tow III) underway heading for the E/N BELCHER, JR. by 3:55 a.m. The Sea Tow I arrived on the scene at 4:15 a.m., only twenty-five minutes after the initial call from the Coast Guard. The Sea Tow III arrived at the scene 4:20 a.m.

This Court concludes that Sea Tow responded to the plight of the tug and barges with a great degree of skill and energy. Further, Sea Tow responded to the distress call with promptitude, in fact, almost immediately.

### Value of Property Employed by Sea Tow

10. The Court concludes that the value of the Sea Tow equipment employed in the salvage effort is $250,000.00. This includes three vessels especially equipped for salvage operations. (See Plaintiff's Exhibit # 3).

### Risk Incurred by Sea Tow

11. With regard to the degree of risk incurred in saving the tug and barges, the combined factors of darkness, depth of water, distance from land, time of night, value of vessels, the danger of explosion from

gasoline, and the danger of the tug rolling over all operated to create a high priority salvage situation. Sea Tow provided the manpower and expertise necessary to prevent the tug from sinking.

Value of the Property Salved

12. Pursuant to a certificate of insurance the value of the E/N BELCHER, JR. is $500,000.00, the value of Barge 10 is $100,000.00, and the value of Barge 18 is $70,000.00. (Plaintiff's Exhibit # 14) Thus, the combined value of the property saved is $670,000.00.

Degree of Danger From Which the Property was. Rescued

13. As the Court has previously noted, the tug was in danger of rolling over and sinking. Moreover, when the barges broke free from the trees on Big Shell Island it was entirely possible that the barges would swing around and strike the E/N BELCHER, JR., as well as the vessels assisting in the salvage operation. The Court concludes that the tug was in a very high degree of danger when Sea Tow began the salvage operation.

Amount of Salvage Award

14. Considering the six factors above, the Court determines that the Plaintiff Sea Tow is entitled to an award of $125,000.00 as fair recompense for the salvage services rendered. This constitutes a fair and equitable salvage award considering the hazards and risk involved, the service rendered, the prompt action taken and the satisfaction of the other elements necessary to justify a salvage award.

15. In light of the foregoing, judgment shall be entered in favor of the Plaintiff, Sea Tow. The Plaintiff shall within ten days submit a proposed form of judgment prepared in accordance with these findings and conclusions. Plaintiff shall also be paid its costs by the Defendant upon filing of a Bill of Costs. The amount of the costs awarded will be determined by the Clerk of Court.

DONE AND ORDERED.