FLAGSHIP MARINE SERVICES, INC.,
d/b/a Sea Tow Services of Lee
County, Plaintiff–Appellee,

v.

BELCHER TOWING COMPANY, Belcher Oil Co., in personam, M/T E.N. Belcher, Jr., her engines, tackle, appurtenances, etc., in rem, Barge 10, her engines, tackle, appurtenances, etc., in rem, and Barge 18, her engines, tackle, appurtenances, etc., in rem, Defendants–Appellants.

No. 91–5571.

United States Court of Appeals,
Eleventh Circuit.

July 14, 1992.

George G. Mitchell, Mitchell, McAlpin & Associates, P.A., Neil O. Bowman, Miami, Fla., for defendants-appellants.

Michael T. Moore, Holland & Knight, Barbara Ehrich Locke, Miami, Fla., for plaintiff-appellee.

Before FAY and BIRCH, Circuit Judges, and DYER, Senior Circuit Judge.

FAY, Circuit Judge:

This case is an appeal from a final judgment entered in a maritime salvage case. Following a four day bench trial, the United States District Court for the Southern District of Florida entered a final judgment awarding the plaintiff $125,000 for the voluntary salvage of a tug boat and two barges. *Flagship Marine Services, Inc. v. Belcher Towing Co.*, 761 F.Supp. 792 (S.D.Fla.1991). Because the district court erroneously failed to recognize that the parties had entered into a legally valid agreement prior to plaintiff's rendering of services, we REVERSE the final judgment entered by the district court and REMAND for a determination of the appropriate damages.

## I. BACKGROUND

On September 14, 1989, Flagship Marine Services, Inc., d/b/a Sea Tow Services of Lee County (hereinafter "Sea Tow"), filed a verified complaint in admiralty in the United States District Court for the Southern District of Florida. Through that complaint, Sea Tow sought an award for voluntary salvage[1] against: Belcher Towing Company, *in personam;* Belcher Oil Co., *in personam;* M/T E.N. Belcher, Jr., her engines, tackle, appurtenances, etc., *in rem;* Barge 10, her engines, tackle, appurtenances, etc., *in rem;* and Barge 18, her engines, tackle, appurtenances, etc., *in rem.* These defendants (hereinafter "Belcher") denied, among other things, that Sea Tow was entitled to an award for voluntary salvage.

### A. *Factual History*

During the early morning hours of July 17, 1989, the tug *E.N. Belcher, Jr.* was en route from Tice, Florida to Boca Grande, Florida via the Okeechobee waterway. At that time, the tug was pushing a tow made up of two empty barges (Barge No. 10 and Barge No. 18) that were lashed together.

At approximately 3:00 a.m., the *E.N. Belcher, Jr.'s* bilge alarm sounded. Responding to this alarm, the tug's crew discovered that the vessel was rapidly taking on water. Apparently, despite light winds and calm inland seas, the tug had struck an unidentified submerged object off Big Shell Island. At approximately 3:05 a.m., the tug's captain, William Diamond, advised the Ft. Myers Beach Coast Guard of both the incident and the observed damage. The Coast Guard then notified the Ft. Myers Fire Department, the Cape Coral Fire Department, the Cape Coral Police Department, and the plaintiff, Sea Tow.

In the minutes that followed the discovery of the damage, Captain Diamond and the crew of the *E.N. Belcher, Jr.* acted quickly. The tug maneuvered the two barges into the shallows of Big Shell Island and wedged each barge, parallel with the shore, among mangrove trees. Having so secured the barges, Captain Diamond and the crew of the *E.N. Belcher, Jr.* then proceeded to intentionally run the tug aground. Running the tug under full power, Captain Diamond tried to ground his vessel as far up the beach as possible.

With the tug and barges apparently beached, the engines of the *E.N. Belcher, Jr.* were shut down and the electrical systems secured. The captain and crew of the tug then collected their belongings and stepped from the deck of the tug onto the adjacent barge. A few minutes later, Captain Diamond reboarded the listing tug and awaited assistance. The *E.N. Belcher, Jr.* was not an abandoned, derelict vessel.

At approximately 3:30 a.m., the Coast Guard arrived to assist the *E.N. Belcher, Jr.*, placing an eductor and two P1 pumps aboard the tug. At approximately 4:00 a.m., the Cape Coral Fire Department arrived with two additional pumps, each capable of pumping 200 gallons per minute. Shortly thereafter, the Ft. Myers Fire Department arrived with a 200 gallon per minute pump and a 1,000 gallon per minute pump. The Cape Coral Police Department also rendered assistance to the tug, but the department was not equipped with pumps.

Sea Tow's first vessel arrived on the scene at approximately 4:15 a.m. In all, three Sea Tow vessels would provide the tug with assistance and up to six additional pumps. Yet, when Sea Tow first arrived on the scene, Captain Diamond delayed Sea Tow's representative from starting his work on the tug and asked him how much Sea Tow's services would cost. Sea Tow's representative, Captain Donald Robinson, responded: "We'll worry about it later." Hearing this, Captain Diamond told Sea Tow to do whatever was necessary to save the tug. Sea Tow had previously charged Belcher for salvage work on a flat running rate basis, and Captain Diamond normally paid for such salvage services.

---

**1.** Throughout this opinion, the terms "pure salvage" and "voluntary salvage" are used interchangeably.

For a period of several hours, various individuals and entities cooperated in a joint effort to refloat the tug. Together, they manned nearly one dozen pumps of various sizes that pumped sea water from the tug's flooded engine room. When the two barges that had formed the tug's tow drifted off the beach with the change of tide, a number of vessels responded in a fifteen to thirty minute cooperative effort that easily pushed the barges back to their initial grounded state. Captain Robinson, one of Sea Tow's salvors, then dove the engine room of the tug under perilous conditions and managed to place a temporary patch of cushions, rags, and wood pieces over the gash that had breached the integrity of the tug's hull. When the tug was refloated, Sea Tow, using contract divers, placed a more permanent exterior patch over the gash in the tug's hull.[2] In addition, Sea Tow deployed precautionary oil booms and stood by to render assistance for several hours after the *E.N. Belcher, Jr.* had been patched.

## B. *Procedural History*

On March 27–29 and on April 2, 1991, the district court tried this case without a jury. On April 19, 1991, the court entered its findings of fact and conclusions of law, awarding Sea Tow $125,000 for pure voluntary salvage. The court then entered its final judgment on April 26, 1991.

Pursuant to Rule 52(b) of the Federal Rules of Civil Procedure, Belcher filed a motion to amend the court's findings of fact and conclusions of law. The district court denied the motion on June 5, 1991, and Belcher filed a notice of appeal on July 1, 1991.

## II. ISSUES

On appeal, Belcher raises three issues. First, Belcher argues that the district court was clearly erroneous when it found that the *E.N. Belcher, Jr.* faced a maritime per-il. Second, Belcher claims that the district court improperly characterized Sea Tow's services as pure salvage rather than contract salvage. Finally, assuming for the purposes of argument that a voluntary salvage award was appropriate, Belcher contends that the district court erred by concluding that Sea Tow was entitled to an award of $125,000.

## III. DISCUSSION

■ In reviewing the district court's findings of fact and conclusions of law, we note that "[n]o greater scope of review is exercised by the appellate tribunals in admiralty cases than they exercise under Rule 52(a) of the Federal Rules of Civil Procedure." *McAllister v. United States,* 348 U.S. 19, 20, 75 S.Ct. 6, 7, 99 L.Ed. 20 (1954). Thus, findings of fact will only be reversed if they are clearly erroneous, *i.e.,* if a reviewing court is left with the definite and firm conviction that a mistake has been committed. *Id.* Yet, the clearly erroneous standard does not govern an appellate court's review of district court findings made under a mistaken view of controlling legal principles. *See, e.g., Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 501, 104 S.Ct. 1949, 1959, 80 L.Ed.2d 502 (1984); *Pullman–Standard v. Swint,* 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982); *Bigge v. Albertsons, Inc.,* 894 F.2d 1497, 1503 (11th Cir.1990); *Keys Jet Ski, Inc. v. Kays,* 893 F.2d 1225, 1227 (11th Cir.1990); *Harris v. Birmingham Bd. of Educ.,* 712 F.2d 1377, 1381 (11th Cir.1983). Such questions involve interpretations of law or applications of law to particular facts and are subject to *de novo* review. Moreover, "[c]ontract interpretation, generally a question of law, is subject to *de novo* review on appeal." *Zaklama v. Mount Sinai Medical Ctr.,* 906 F.2d 650, 652 (11th Cir.1990).

■ In order to make out a claim for pure salvage—as opposed to contract sal-

---

**2.** Atlantic Divers, the professional diving outfit that placed the exterior patch on the *E.N. Belcher, Jr.,* was hired and paid by Sea Tow. Apparently, Atlantic Divers never requested any payment from Belcher. However, the public agen-cies that came to Belcher's assistance on July 17, 1989 did submit bills to Belcher to defray the costs and expenses of the services that they rendered. Belcher appears to have paid those bills as they were submitted.

vage—a salvor must establish three elements: "1. A marine peril. 2. Service voluntarily rendered when not required as an existing duty or from a special contract. 3. Success in whole or in part, or ... service ... contribut[ing] to such success." *The Sabine*, 101 U.S. (11 Otto) 384, 25 L.Ed. 982 (1879); *see also Klein v. Unidentified Wrecked & Abandoned Sailing Vessel*, 758 F.2d 1511, 1515 (11th Cir.1985). Belcher contends that two of these elements are missing from Sea Tow's case: (1) a marine peril, and (2) service that was voluntarily rendered.[3]

■ In ascertaining whether services rendered by a salvor are voluntary, "the rule is that nothing short of a contract to pay a given sum for the services to be rendered, or a binding engagement to pay at all events, whether successful or unsuccessful in the enterprise, will operate as a bar to a meritorious claim for salvage." *The Camanche*, 75 U.S. (8 Wall.) 448, 477, 19 L.Ed. 397 (1869). Moreover, "[t]he fact that a shipowner requests a salvage service and that the salvors in response furnish it, *standing alone*, does not create an implied contract so as to defeat a salvage claim." *Fort Myers Shell & Dredging Co. v. Barge NBC 512*, 404 F.2d 137, 139 (5th Cir.1968) (emphasis added). Under the factual findings made by the district court, and in light of the evidence found in the record, we agree that there was no contract to pay a given sum for the services Sea Tow rendered; nonetheless, we cannot agree with the district court's conclusion that the services Sea Tow rendered were voluntary salvage services.

Clearly, Sea Tow had no initial duty to come to Belcher's assistance. Yet, when Sea Tow arrived on the scene, the exchange between Captain Diamond and Captain Robinson created a binding engagement in which Belcher undertook to pay Sea Tow for its services, whether or not those services proved successful. The district court misapplied the law to the facts of this case, however, and reached the erroneous legal conclusion that "the conversations that took place between Sea Tow and Captain Diamond did not rise to the level of either a contract between the parties, or a special oral agreement," *Flagship Marine Servs.*, 761 F.Supp. at 796 (citing *Brown v. Johansen*, 881 F.2d 107 (4th Cir.1989)).[4]

The evidence presented to the district court revealed that Sea Tow and Belcher had done business together prior to the incident off Big Shell Island. R6:262. In fact, Sea Tow admitted that it had previously done salvage work for Belcher on a flat running rate basis. *Id.* Accordingly, when Sea Tow arrived to assist the *E.N. Belcher, Jr.*, Captain Diamond took Sea Tow's representative aside and inquired about the price of Sea Tow's services. *Flagship Marine Servs.*, 761 F.Supp. at 794; *see also* R6:230; R7:407. Although Sea Tow and Belcher did not set either a

---

**3.** Because we resolve this appeal on the basis that Sea Tow's services were not voluntarily rendered, we do not reach the issue of marine peril. We do note, however, that the district court's findings of marine peril are reversible only if clearly erroneous. Here, the district court carefully articulated its reasons for finding that the tug was in peril. Yet, although the district court concluded that the two drifting barges presented a potential danger to the tug, to innocent marine traffic, and to some of the vessels assisting the tug, the court made no finding that the barges themselves were in any peril. *See Flagship Marine Servs.*, 761 F.Supp. at 794, 795.

**4.** In making this decision, the district court's role was not only to determine what Sea Tow and Belcher did and said on the deck of the *E.N. Belcher, Jr.*, but also to determine the legal consequences that had attached to the parties'

words and actions. In doing so, the district court relied on *Brown v. Johansen*, 881 F.2d 107 (4th Cir.1989).

Because the conversations between the *Brown* parties occurred in a completely different context than the conversation in the instant case, however, we find that the district court's reliance on *Brown* was misplaced. For example, the defendant in *Brown* never inquired about the charges for salvage work before authorizing such work. More importantly, the conversations between the *Brown* defendants did not occur in the context of a prior business relationship involving salvage services.

Although we do not quarrel with the district court's findings as to the words and actions of either Sea Tow or Belcher, the court's failure to attribute legal significance to the business context of the parties' words and actions requires us to reverse the court's judgment.

price or rate for Sea Tow's services amid the confusion and turmoil aboard the *E.N. Belcher, Jr.*, 761 F.Supp. at 794, Captain Robinson (of Sea Tow) told Captain Diamond (of Belcher): "We'll worry about [the price] later." R7:407. Captain Diamond then authorized Sea Tow to do whatever was necessary to save the tug.[5]

From the exchange between Captain Robinson and Captain Diamond, Sea Tow and Belcher reached a valid oral agreement which bars Sea Tow from recovering an award on the basis of pure voluntary salvage. Sea Tow offered its services to Belcher for a reasonable charge that was to be determined later. Belcher then authorized Sea Tow to perform whatever services were necessary to save the tug, agreeing to pay for the services at that subsequently-determined price. More importantly, because of the pre-existing business dealings between Sea Tow and Belcher, Belcher's authorization bound Belcher to pay for the services that Sea Tow rendered—whether or not such services proved successful. Due to the prior course of dealings between Belcher and Sea Tow, when Sea Tow provided assistance to the Belcher vessels following the verbal exchange between Captain Diamond and Captain Robinson, Sea Tow also agreed to Belcher's engagement to pay a reasonable price for the services rendered, regardless of success. Sea Tow was no longer assuming the "no cure, no pay" risks associated with pure voluntary salvage. If its efforts to save the Belcher vessels had proved unsuccessful, Sea Tow would nonetheless have been entitled to compensation from Belcher at a reasonable price and rate.

**5.** Captain Diamond later testified that Sea Tow "would have been exited off the boat immediately" if its agents had indicated that their services were being provided as pure salvage service. *See* R7:408. The parties do not dispute that Captain Diamond would have had the right, under such circumstances, to reject Sea Tow's services and to remove Sea Tow's agents from the Belcher vessels. *See* R8:498 (Sea Tow's closing argument).

**6.** Because we hold that Sea Tow did not render voluntary salvage service to Belcher, we do not reach Belcher's contention that the district court

## IV. CONCLUSION

For the reasons set forth above, we RE-VERSE the final judgment awarding Sea Tow $125,000 for voluntary salvage services. Nonetheless, because Sea Tow is entitled to compensation from Belcher at a reasonable price and rate, we REMAND to the district court for a determination of the appropriate damages.[6]

erred in determining the amount of Sea Tow's voluntary salvage award.

We note, however, that Sea Tow did prepare an invoice, totaling $24,281, that "represent[ed] a calculation of what the salvage job would have cost had it been on a straight time and material basis." *Flagship Marine Servs.*, 761 F.Supp. at 796. Yet, that invoice was never delivered to Belcher. Because the district court decided that Sea Tow was entitled to a voluntary salvage award, the court never reached a determination of the reasonableness of the charges that appeared on Sea Tow's undelivered invoice.