### OCEAN SERVICES TOWING AND SALVAGE, INC., Plaintiff,

v.

Kenneth BROWN and Muriel Brown, in personam, and S/Y ASYLUM, O.N. 644337, her engines, equipment, machinery and appurtenances, in rem, Defendants.

No. 91–2352–Civ.

United States District Court, S.D. Florida.

Jan. 7, 1993.

**1260**

John T. Howard, Miami, FL, for plaintiff.

William Scherer, Conrad Sherer & James, Ft. Lauderdale, FL, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MARCUS, District Judge.

THIS CAUSE was tried before the Court without a jury on December 21 and 23, 1992. In this action, Plaintiff, Ocean Services Towing and Salvage, Inc. ("Ocean Services"), a commercial towing and salvage company in the business of aiding distressed boats for profit, sues for a salvage award for their efforts in rescuing a distressed boat, the S/Y "Asylum" on May 5, 1991, off Key Largo, Florida. This Court has admiralty and maritime jurisdiction over this cause under 28 U.S.C. § 1333 and Rule 9(h) of the Federal Rules of Civil Procedure. Pursuant to Rule 52(a) of the Federal Rules, the Court hereby makes the following Findings of Fact and Conclusions of Law.

### Findings of Fact

1. On May 5, 1991, defendants Kenneth Brown and Muriel Brown were the owners of a 1984 forty-foot Bristol Sloop sailing vessel known as the S/Y "Asylum." On that date, the Browns were sailing the "Asylum" in the vicinity of Pacific Reef Light off the coast of Key Largo, Florida. The weather conditions were fair with two- to four-foot seas.

2. At approximately 2:00 P.M., the "Asylum" began to take on water through a leak in a faulty through-hull fitting. The ocean water in the boat had already disabled the "Asylum's" batteries, rendering their radio inoperative. The Browns manually signalled to the "Brew Crew," a nearby pleasure craft captained by Robert Kanagie, to come to their assistance. At approximately 2:10 P.M., the "Brew Crew" placed a radio distress call to the Coast Guard, approached the "Asylum," and then permitted the Browns and their dog to board. The Coast Guard responded and indicated that they would be arriving on the scene shortly.

3. The radio call was intercepted by Captain Dennis Stanley, the owner of Ocean Services. Stanley arrived at the scene approximately thirty minutes later at 2:40 P.M. in the first Ocean Services vessel, the "Offshore Runner," a twenty-five-foot cuddy cabin. Stanley advised the Browns that he was offering commercial assistance and showed Kenneth Brown a form contract, proposing that he sign it. Kenneth Brown declined, but orally agreed with Stanley that Stanley's efforts would be "no cure, no pay," that is, Brown would pay Stanley only in the event of a successful salvage of the sinking ship, the amount to be agreed upon later.

4. At no time were the lives of the Browns, their dog, Ocean Services personnel, or "Brew Crew" captain and crew in danger. The sinking of the "Asylum," on the other hand, was imminent, as there was credible testimony that the water level at times closely approached the top of the entrance to the cabin, and at times the decks were awash. *See* Jacques Depo. at 46.

5. While Stanley and the Browns were negotiating their oral contract, Stanley tied a line to the S/Y "Asylum" and placed two water pumps aboard the vessel, one battery-powered and one gas-powered. The battery-powered pump was handed to Normand Jacques, a crew member of the "Brew Crew," also assisting in the rescue operation. Neither the gas- nor the bat-

tery-powered pumps were functioning properly, and were largely ineffective at ridding the sinking "Asylum" of ocean water.

6. At approximately the same time that the first Ocean Services boat arrived, a Coast Guard helicopter flew overhead and dropped a Coast Guard gas pump into the water. Jacques retrieved the pump but he and Mr. Brown, both aboard the "Asylum" at this time, could not start it. Immediately thereafter, a Coast Guard auxiliary vessel, the "R.H. Coleman" arrived on the scene, and then the second Ocean Services vessel, the "Offshore Salvor," captained by Don Minchin and crewed by his 14–year-old daughter arrived and tied on to the stern of the "Asylum." Shortly thereafter Coast Guard vessel 514 arrived on the scene and boarded the "Asylum." Minchin requested that the Coast Guard retrieve another gas pump from the "Offshore Salvor," but Stanley ordered that this not be done.

The Coast Guard then gave instructions as to how to operate the dropped Coast Guard gas pump which Minchin and Jacques finally engaged, and the second Ocean Services gas pump was placed aboard the "Asylum" by the crew of the Coast Guard vessel after it was retrieved from the second Ocean Services vessel. Those two gas pumps functioned effectively, and, in combination with another gas pump supplied by the Coast Guard Auxiliary, eliminated enough water to stabilize the "Asylum" as well as permit Kenneth Brown to locate and plug the leak. Ocean Services then towed the "Asylum" to Ocean Services's headquarters at Black Pointe Marina.

7. At the height of the operation, the following four people were aboard the "Asylum" assisting in the dewatering efforts, but at no time during the salvaging was anyone else on board: Ken Brown, Jacques of the "Brew Crew," Minchin of Ocean Services, and an unidentified member of the Coast Guard Auxiliary. The salvaging of the "Asylum" was directly attributable to the combined efforts of Mr. Brown, Jacques and Kanagie of the "Brew Crew," the Coast Guard and Coast Guard Auxiliary, Minchin and Stanley of Ocean Services, and Minchin's daughter. Based on a thorough review of all the facts adduced at trial, the Court finds that Ocean Services was fifty percent responsible for the successful salvage.

8. The value of the Ocean Services vessels and their equipment involved in the salvage was in the vicinity of $116,000. Captain Stanley testified on cross examination that the replacement value of the two boats totalled $100,000 each equipped with approximately $8,000 of gear.

9. After towing, the "Asylum" was finally moored at Black Pointe Marina, approximately five hours after the initial distress call was placed by the "Brew Crew." The next day, Ocean Services flushed and preserved the engine, and placed a plastic skirt around the boat to prevent any pollutants leaking from the "Asylum" from contaminating the marina.

10. Norseman Shipbuilding Corporation was instructed by Ken Brown to haul the "Asylum" into dry dock, to wash and clean the "Asylum," to remove oil residue from its surface, to test and periodically run the engine, to plug the hole in the hull and check for other leaks, and to estimate the cost of total repairs and new equipment necessary. The estimate supplied was $52,785.75 for repairs and equipment.

11. Plaintiff's expert testified that the pre-casualty value of the "Asylum" was $103,000 based on the value of similar boats of comparable age estimated by the N.A.D.A. Large Boat Appraisal Guide. Defendant's expert testified that the B.U.C. and A.B.O.S. marine appraisal guides suggested an $80,000 pre-casualty value of the "Asylum."

12. The "Asylum" was advertised for sale through a salvage broker. The Browns received several bids, finally accepting the highest on August 23, 1991 and selling the boat for $16,100. The vessel was marketed in a commercially reasonable manner and the sale was negotiated in an arm's length transaction.

*Conclusions of Law*

■■■■ 1. The admiralty and maritime law of salvage rewards the voluntary salvor for his successful rescue of life or property imperiled at sea. *See Mason v. The Blaireau*, 6 U.S. 240, 266 (2 Cranch), 2 L.Ed. 266 (1804) (Marshall, C.J.). The award on an action for salvage—unknown for land activities—is not one of *quantum meruit* as compensation for work performed, but is a bounty historically given in the interests of public policy, to encourage the humanitarian rescue of life and property at sea, and to promote maritime commerce. *See generally, The Blackwall*, 77 U.S. 1 (10 Wall.), 19 L.Ed. 870 (1869); *Seven Coal Barges*, 21 F.Cas. 1096, 1097–8 (C.C.D.Ind.1870) (No. 12, 677) (quoted in 3A M. Norris, Benedict on Admiralty § 232 at 19–3 (1992)) ("The very object of the law of salvage is to promote commerce and trade, and the general interest of the country, by preventing the destruction of property, and to accomplish this by appealing to the personal interest of the individual as a motive of action, with the assurance that he will not depend upon the owner of the property he saves for the measure of his compensation, but to a court of admiralty, governed by principles in equity."); *Seaman v. Tank Barge OC601*, 325 F.Supp. 1206, 1209 (S.D.Ala.1971). The fact that the salvor's efforts have pecuniary motivations is immaterial to his entitlement to a salvage award, as long as the prerequisites for a salvage claim have been proven. *See Flagship Marine Serv., Inc. v. Belcher Towing Co.*, 761 F.Supp. 792, 795 (S.D.Fla.1991), *rev'd on other grounds*, 966 F.2d 602 (11th Cir.1992); *Unnamed But Identifiable Master and Crew v. Certain Unnamed Vessel*, 592 F.Supp. 1191 (S.D.Fla.1984).

■■■■ 2. Three elements for a valid salvage claim must be found:

(a) a maritime peril from which the ship or other property could not have been rescued without the salvor's assistance;

(b) a voluntary act by the salvor under no pre-existing official or contractual duty to the owner; and

(c) success in saving, or in helping to save at least part of the property at risk.

*See The Sabine*, 101 U.S. 384, 25 L.Ed. 982 (1879); *Klein v. Unidentified Wrecked and Abandoned Sailing Vessel*, 758 F.2d 1511 (11th Cir.1985); *Belcher*, 761 F.Supp. at 795.

■■■■ 3. It is undisputed that without the collective salvage efforts, the "Asylum" would have sunk on the afternoon of May 5, 1991. It is also undisputed that Ocean Services was in no way under prior obligation to the "Asylum" or its owners and responded voluntarily pursuant to its business practice of monitoring the emergency radio channels for and responding to calls for distress. The case at bar is unlike the situation in *Flagship Marine Services, Inc. v. Belcher Towing Co.*, 966 F.2d 602 (11th Cir.1992), which held that the salvage services were not provided voluntarily, and thus a claim for salvage could not exist. In that case, the Eleventh Circuit found that the words exchanged between the distressed captain and the salvor to the effect that they would "worry about the price later" created a binding oral engagement in which the distressed captain agreed to pay the salvor for its services whether or not the services were successful. *See id.* at 605. Notably, the parties in *Belcher* had prior dealings in which the salvor had previously done salvage work for the captain on a flat running rate basis. Based on the prior course of dealings between the parties, and the verbal exchange at the time of the salvage, the Eleventh Circuit found that the salvor "was no longer assuming the 'no cure, no pay' risks associated with pure voluntary salvage." *Id.* at 606. In contrast, the conversation between Stanley and Kenneth Brown upon the arrival of the "Offshore Runner" to the scene clearly indicated an agreement to a "no cure, no pay" arrangement, and that phrase was, in fact, expressly used by Stanley, according to his uncontroverted testimony. No history of dealings between the parties existed to indicate that the salvage was anything but voluntary. Therefore, all of the formal elements of a valid salvage claim are present.

4. In *The Blackwall,* 77 U.S. 1 (10 Wall.), 19 L.Ed. 870 (1870), Justice Clifford set out the six factors to be considered in determining the amount of the salvage award. The Second Circuit has arranged them in descending order of importance as follows:

(a) the degree of danger from which the ship was rescued;

(b) the post-casualty value of the property saved;

(c) the risk incurred in saving the property from impending peril;

(d) the promptitude, skill and energy displayed in rendering the service and salving the property;

(e) the value of the property employed by the salvors and the danger to which it was exposed;

(f) the costs in terms of labor and materials expended by the salvors in rendering the salvage service.

*See B.V. Bureau Wijsmuller v. United States,* 702 F.2d 333, 339 (2d Cir.1983); *accord Brown v. Johansen,* 881 F.2d 107 (4th Cir.1989) (noting hierarchy of factors); *accord, Platoro Ltd. Inc. v. Unidentified Remains of a Vessel,* 695 F.2d 893, 904 (5th Cir.), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983) (listing factors in this order); *see also Belcher,* 761 F.Supp. at 796; *Certain Unnamed Vessel,* 592 F.Supp. at 1194.

5. The degree of danger to the "Asylum" was maximal: the "Asylum" would have sunk but for the salvage efforts.

■ 6. The value of the salved boat is only one of the factors to be considered in fixing a salvage award. Indeed, it should not be the principal guide for determining the award, but should be merely a factor to be considered along with the others. *See The New Camelia,* 105 F. 637, 640–41 (5th Cir.1900) ("In our opinion, consideration should have been given to the character of the services rendered, as well as the value of the salved vessel; and, considering all the elements which should enter into the allowance for salvage, we are of opinion that in this case the compensation allowed should be mainly on the basis of the towage services actually rendered, and any large allowance would be judicial liberality at the expense of suffering owners, not in fault, and already burdened by the accident to their vessel."); *San Francisco Bar Pilots v. The Vessel Peacock,* 733 F.2d 680, 682 (9th Cir.1984). The salved value is the post-casualty value of the property, in her damaged state, at the time of the salvage or after the vessel is brought into safe harbor. *See Beach Salvage Corp. of Florida v. The Cap't Tom and the Tom R. Jr.,* 201 F.Supp. 479, 483 (S.D.Fla.1961); 3A Benedict on Admiralty at § 259.

■ Ordinarily, the fair market value of the property determines the property value for purposes of considering this factor. *See Nolan v. A.H. Basse Rederiaktieselskab,* 267 F.2d 584, 588–9 (3d Cir. 1959) (noting also that replacement cost is not the determinant of salved value); *Peacock,* 733 F.2d at 682. Use of a pre-casualty book value for the boat and subtracting estimated repair costs is a permissible method where there is no established market value for a vessel. *See Peacock,* 733 F.2d at 682; *Rand v. Lockwood,* 16 F.2d 757 (4th Cir.1927). Where a book value is available, or a market *price* has been fixed for the boat by an actual sale, use of the insured value of the boat would be improper. *See Peacock,* 733 F.2d at 682. Boats or other property may be insured at an inflated value to allow for replacement cost, or to cover any mortgage liens that may attach.

■ In any event, where an actual sale of the vessel has occurred after the salvage, and the sale was conducted in a commercially reasonable manner, there can be no doubt that the actual selling price is the best manifestation of the fair market value of the boat. *Cf. In the Matter of Chicago, Rock Island and Pacific R.R. Co.,* 794 F.2d 1182, 1185 (7th Cir.1986) ("An actual price ... is a far better indicator of the value of *this* parcel than is a hypothetical price based on sales of other parcels.").

■ The "Asylum" was marketed in a commercially reasonable manner, and the sale was negotiated at arm's length, with no conduct attending the marketing or sale

of the vessel attributable to the seller which would have adversely affected the sale price. Further, the Court heard testimony from Mr. Brown, which it credits, that the boat was properly cleaned and the engine flushed and maintained in order to attract higher bids. Accordingly, we find that the value of the salved "Asylum" to its owners was $16,100.

7. Significant risks to lives and property inhere in any peripatetic salvage operation such as this one, which required shuttling between several vessels on undulating two- to four-foot seas, *see* Jacques Depo at 43, and standing in a sinking boat in rising water and handling electrical equipment. According to the testimony of Minchin, no lives were ever in danger during the rescue effort, and the Coast Guard was standing by to render assistance should the need have become dire. Although an Ocean Services vessel was tethered to the "Asylum," the Ocean Services vessel—which contained Minchin's young daughter—was never subject to the risk of sinking along with the "Asylum" since, according to Minchin's testimony, the tether line could easily have been cut at any time.

8. In terms of the promptitude factor, the Ocean Services vessels responded to the distress call with great alacrity, their personnel contributed at least one functional pump and helped retrieve, engage and maintain operation of the others, and towed the "Asylum" to safety.

9. As noted above the value of the salvors' property employed in the salvage operation was approximately $116,000, and it was exposed to a minimal amount of danger. There was no testimony that either Ocean Services vessel was damaged in the course of the salvage.

10. The hourly rates charged by Ocean Services for its contract customers range between $75.00 and $125.00 per hour for the "Offshore Salvor," and between $60.00 and $100.00 per hour for the "Offshore Runner." *See* Def. Ex. 1. The duration of the salvage was, at most, five hours, with two Ocean Services boats involved, although the "Offshore Runner" containing Minchin arrived after the "Offshore Sal-

vor" and left before the towing was completed. Captain Stanley testified that he expended disposable equipment in the course of the salvage, including ropes and oil pollution containment equipment, and he also supplied a security guard to watch the "Asylum" during the night after the salvage, and that he employed divers to check the boat when it was in Black Pointe Marina. No bill of costs has been submitted to the Court save the $160.40 receipt for the pollution containment skirt. *See* Ex. 6.

11. The salved value generally serves as a ceiling for the maximum allowable total award. *See Allseas Maritime, S.A. v. M/V Mimosa*, 812 F.2d 243, 247 (5th Cir.), *reh'g denied*, 820 F.2d 129 (1987); *Platoro*, 695 F.2d at 904. We need not address whether there exists an exception to this principle where the salvage operation averted the owner's potential exposure to liability for environmental damage, since the testimony at trial failed to establish by a preponderance of the evidence that damage to protected coral reefs would have occurred but for the successful salvage.

12. Considering together the aforementioned six factors, and taking into account the portion of the successful salvage operation attributable to Ocean Services, the Court determines that Ocean Services is entitled to an award of $8,000. This award includes compensation for the costs of labor and materials expended by the salvors.

13. We can see no reason to reduce this award because of any claimed negligence attributable to the plaintiff alleged to have occurred during the towing of the boat through a shallow strait. Proof of negligence requires a showing of a duty, a breach of the duty, proximate cause, and actual loss or damage resulting to the interests of another. The damages component of such negligence would be a depressed sale price of the salved "Asylum," such that defendants would have received less from the sale of the boat than they would have absent the negligence. But there can be no economic damage presumed here without proof that the ship was actually damaged as a result of the groundings. The Marine Surveyor's damage ap-

praisal fails to indicate any repairs necessary as a result of any structural damage to the "Asylum" that might have been caused by a grounding during towing. *See* Def. Ex. 4. Further, there was no testimony that the ultimate sale price was in fact lower than it would have been because the buyer accounted for such a defect in his bid. Taken as a whole, the evidence does not establish that Ocean Services was negligent in towing the "Asylum."

14. Although the complaint requests an award of attorney's fees, the pretrial stipulation, signed by counsel for both parties, indicates a stipulation that the issue of attorney's fees is "not applicable." In any event, in admiralty cases, it is the general rule that absent some statutory authorization, the prevailing party is not entitled to an award of attorney's fees. *See Noritake Co. v. M/V Hellenic Champion,* 627 F.2d 724, 730, 730 n. 5 (5th Cir. 1980) (noting that an exception is provided for indemnitee in suit against indemnitor as part of reasonable expenses of defending against the claim); *Compania Galeana, S.A. v. M/V Caribbean Mara,* 565 F.2d 358 (5th Cir.1978) (attorney's fees may be awarded in admiralty where losing party has acted in bad faith); *see also Platoro,* 695 F.2d at 905–6. Consequently, we decline to award attorney's fees.

Accordingly, it is hereby

ORDERED AND ADJUDGED that judgment is entered in favor of plaintiff and against defendant in the amount of $8,000.00. This judgment shall bear interest at the rate of 3.43% from May 5, 1991 to the date of this judgment, and shall bear interest at the same rate from the date of this judgment. *See* 28 U.S.C. § 1961 (West Supp.1988); *Insurance Co. of North America v. M/V Ocean Lynx,* 901 F.2d 934, 942 (11th Cir.1990); *see also Bartholemew v. CNG Producing Co.,* 832 F.2d 326, 330 (5th Cir.1987). Plaintiff shall submit a proposed Order of Final Judgment within ten (10) days of this Order.

DONE AND ORDERED.