THE STRAITS OF GIBRALTAR.

DRISCOLL *v.* THE STRAITS OF GIBRALTAR, Her Cargo, etc.

HICKS and others *v.* SAME.

*(District Court, D. New Jersey.* September 10, 1887.)

1. SALVAGE—TOWING BURNING LIGHTER AWAY FROM VESSEL.
   While a steamer was discharging a cargo of saltpeter into a lighter, and after about 100 tons had been delivered, the saltpeter on the latter took fire, and spread with such rapidity as to compel the men to abandon the lighter, which was at once cast loose, and drifted under the port quarter of the steamer. The flames rose very high, but the wind blew them from the steamer, which was an iron-built one. There still remained on board the latter about 550 tons of saltpeter. While in this situation, the libelant's tug made fast to the lighter, and pulled her out of the slip, into the river, where she burned to the water's edge in about 40 minutes after first taking fire. *Held,* that the libelant was entitled to salvage.

2. SAME—AMOUNT AWARDED.
   Five hundred dollars was held to be a proper compensation for salvage services rendered by the tugs of libelant, worth about $17,000, in pulling a burning lighter loaded with saltpeter away from a steamer valued at $115,000, there being other tugs present who would have performed the same service.

3. SAME—COSTS.
   Where the court decrees that libelant is entitled to salvage, he is also entitled to costs, although his original claim may have been exorbitant, the defendant having refused to offer any compensation whatever.

In Admiralty.

*John Griffin,* for libelant Driscoll and tug Jesse Russell.

*E. D. McCarthy,* for libelant Hicks and tug Harry Roussell.

*Butler, Stillman & Hubbard,* for respondent steam-ship Straits of Gibraltar.

WALES, J. These are libels for salvage services rendered to the British steam-ship Straits of Gibraltar while lying at the Inman pier, Jersey City, on the twenty-sixth of May, 1886. The steamer had discharged into a lighter, fastened to her port side, 1,305 bags of saltpeter, weighing in all 110 tons, and the men had just knocked off work and gone to dinner, when one of the bags on the lighter was discovered to be on fire. Immediately on the alarm being given the chief officer, with two or three of the crew, jumped into the lighter and tried to smother the flames with a tarpaulin, and at the same time the steamer's hose was laid and attached to the donkey-engine. The flames spread with such rapidity that the men were soon driven from the lighter, which was then cast loose from the steamer, and pushed down the slip and towards the river, the steamer's hose in the mean time throwing water on the burning mass, until the lighter passed under the port-quarter of the steamer and lodged with one end near the steamer's rudder, and the other near or close up to the pier. By this time the fire had extended all over the midship, and to within 10 feet of each end of the lighter, which was 80 feet long, and the flames rose as high as the flag-staff and awning of the

steamer, both of which were scorched but not consumed. The bull's-eye windows at the stern of the steamer were cracked or broken by the heat, and the paint was burned off the iron plates. The wind was from the south and west, blowing off shore, and carried the flames and smoke away from the steamer. Water thrown on the burning saltpeter had little or no effect in extinguishing the fire, and when the lighter had lodged or gone under the overhang of the steamer, the hose from the latter could not reach it.

At this juncture the tugs of the libelants appeared on the scene. The Harry Roussell, the larger tug, came first, and entered the slip stern foremost; but, having too much sternway, went too far in, and, before he could go ahead again, the Jessie Russell run in, bow on, striking against the port-bow of the lighter, to which she made fast by a line, and then attempted to back out and draw the lighter after her. This movement, however, did not succeed, owing to the position of the Jessie Russell, which was athwart the slip with her bow within a few feet of the lighter, and her stern nearly touching the steam-ship Rhynland, which was lying at the Red Star pier, on the opposite side of the slip, the slip being 164 feet wide. The Jessie Russell, having a right-hand wheel, moved back to port, and thus threw her stern further in the slip, as she had not room enough to get sufficient sternway to make her rudder of any service to her. Under these circumstances, the Jessie Russell being comparatively helpless either to pull off the lighter, or to save herself, the Harry Roussell, at the request of her captain, threw a line which was made fast to the port stern of the Jessie Russell, and, shoving the latter aside, steamed out of the slip, taking along with him both the tug and the lighter, the Jessie Russell forming, as it were, a link on the tow line between the lighter and the Harry Roussell. In a few minutes after getting into the river the lighter burned to the water's edge, and sank. The Straits of Gibraltar was an iron-built vessel with iron deck, masts, and rigging, two years old, and worth at least $100,000. The cargo remaining on board is admitted to have been worth $15,000. The Harry Roussell was valued at $14,000, and the Jessie Russell at $3,000.

I have no doubt that the libelants are entitled to salvage, and the only question is what amount should be allowed to them. This question is· always more or less embarrassing to a judge, who has to distinguish between what would be a fair compensation, *pro opere et labore*, and a sufficient and ample reward for the enterprise and energy voluntarily exercised by salvors. The libelants' services were promptly rendered at a time when the steamer appeared to be in great peril, and they exposed themselves and their tugs to considerable danger in taking the lighter, loaded with a burning mass of saltpeter, from under the steamer's quarter. It is true that the fire department of Jersey City came on the pier at which the steamer was moored, before the lighter was removed, and most probably would have prevented a total loss, or even any very extensive injury to the ship or cargo; also that several other tugs had come to the rescue, and were lying off the dock, ready to give needed assistance; but these facts should not detract from the merit which is due to

the libelants for their conduct in braving the actual danger which they encountered in hauling out the lighter. It is also true that a very brief time elapsed from the moment the alarm was given until all danger to the ship was over,—perhaps not more than 35 to 45 minutes; but the alacrity and speed with which the work was performed should increase its value, as each minute of delay would have only added to the peril and injury of the steamer. Five hundred and forty-seven tons of saltpeter still remained in the hold of the ship, and although the hatchways were securely covered, and the iron plates of the ship might have resisted the fire for an indefinite time, yet it was possible, had the lighter been allowed to remain under the stern, for the heat to have been communicated to the interior, in which case a serious disaster might have occurred. These are mere possibilities, but in estimating the degree of danger they are not to be lost sight of. The essential ingredients of salvage service were present in this case. The libelants expended labor and exercised promptitude and skill. The value of the property employed by them in the service was considerable, and their property was exposed to danger. The libelants themselves incurred some risks, the captain of the Roussell having been driven into his pilot house to escape the scorching heat and fiery shower of burning and exploding saltpeter. The property saved from destruction or injury was valued at not less than $115,000. *The Blackwall*, 10 Wall. 14.

But after all, it must be admitted that other tugs were present at the Inman pier, or near by, who could and would have given the assistance which was rendered by the libelants, and that the services of the latter, though prompt and successful, were not indispensable. After a careful consideration of all the facts, I have concluded to award to the Harry Roussell the sum of $350, and to the Jessie Russell the sum of $150, with costs. A decree will be entered for the libelants accordingly.

The claimants' proctor contended with much zeal that the libelants should not be allowed costs, because their original claims were exorbitant, and that the owners of the steam-ship were thereby subjected to extraordinary trouble and expense in obtaining sureties for their bond. It may be that the libelants were unreasonable in making an excessive demand, but the claimants were not less so in refusing to offer any compensation whatever; and (adopting the language of Judge BUTLER, in *The Indiana*, 22 Fed. Rep. 925,) "in the absence of any offer of adequate compensation, and considering the ease with which the respondent here might have had relief by application to the court, I do not feel called upon to withhold costs."