## RAND v. LOCKWOOD.

(Circuit Court of Appeals, Fourth Circuit. January 11, 1927.)

### No. 2565.

1. **Salvage ⚖═26—"Salvage value," in case of no market value, must be determined according to value to owner, considering reproduction cost.**

In appraising property for salvage purposes, "value," must be determined according to what it will bring in market, if it has such value; otherwise, its value to owner, either for its earning capacity or for pleasure he gets out of it, considering reproduction cost, with proper allowance for general and special depreciation.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Salvage.]

2. **Salvage ⚖═26—Salvage property should not be appraised at more than worth to owner.**

Property, in a salvage case, is valued, not for purpose of paying its salvor for partial or total destruction or appropriation, but solely because what it is worth is one of several factors to be considered in fixing reward, and it

should not be appraised at more than its worth to owner.

3. **Salvage ⚖═27—Allowance of $2,500 for salvage of gasoline launch held excessive and reduced to $1,500.**

Salvage allowance of $2,500 for salvage of gasoline motorboat held excessive, and reduced to $1,500, since although reproduction cost would be considerable, there was no market value, and owner used it only for pleasure purposes.

Appeal from the District Court of the United States for the Eastern District of South Carolina, at Charleston; Ernest F. Cochran, Judge.

Libel by George McD. Lockwood, as master of the steam tug Cecilia, against J. H. Rand, Jr., owner and claimant of the gasoline motorboat Spitfire II. Decree for libelant, and respondent appeals. Decree modified.

Thomas H. Middleton and E. Willoughby Middleton, both of Charleston, S. C. (Middleton & Middleton, of Charleston, S. C., on the brief), for appellant.

Harold A. Mouzon, of Charleston, S. C. (Alfred Huger and Miller, Huger, Wilbur & Miller, all of Charleston, S. C., on the brief), for appellee.

Before ROSE and PARKER, Circuit Judges, and WATKINS, District Judge.

ROSE, Circuit Judge. This is a salvage case, in which the owner of a gasoline motor yacht complains that a salvage award of $2,500 is excessive. The parties will be spoken of as the owner and the salvor; the boats, as the yacht and the tug.

The yacht was a wooden pleasure craft driven by gasoline motors, and was approximately 75 feet over all, with a beam of 13 feet and a depth of 4. On the afternoon of January 28, 1926, she was tied up at filling station No. 1 on the north side of Adger's wharf in Charleston harbor and within a few feet of two gasoline pumps. The stern of another wooden vessel was within 4 feet of her. She had finished filling her two engine room tanks with gasoline. One of them had a capacity of 100 gallons and the other of 175. There were 600 additional gallons in her other tanks. The caps on those newly filled were being screwed down, when there was an explosion in the room. It was immediately enveloped in flames, which leaped 15 feet in the air. Three of the crew, including the master, were on board. They jumped into the water; the master having been burned and the clothing of another one of her men having been set on fire. The first

thought of the master and the others on the wharf was to get the yacht away from the filling stations before the gasoline in them was ignited. Her lines were loosened, and she was pulled by man power to the end of the wharf and cast adrift.

At the time of the explosion the tug was tied up in the same slip, but on its opposite side and 150 feet nearer the stream. She had steam up and a full crew of four persons on board. Two deck hands from a pilot boat were standing at the time on the wharf, and sprang aboard her to assist in the salvaging. She was a wooden boat about 100 feet long and with engines of 450 horse power. She was worth about $40,000. She had a powerful pump, capable of handling eight 2½-inch streams. She was otherwise equipped for salvage service, in which she had been frequently engaged. Indeed, as the city of Charleston has no municipal fireboat, she is often so used under an arrangement by which her services are paid for at the rate of $50 per hour. For ordinary towing work she charges $25. Shortly after the explosion took place, she cast off her lines, followed the yacht out of the slip into the stream, and from some distance threw a stream of water on it. This soon checked the fury of the flames, and the tug's people went aboard the yacht and extinguished the remains of the fire. All was over in less than half an hour.

The advocates for the owner say the tug incurred very little, if any risk, in rendering the service; that her labor was not severe, and was of but 15 minutes' duration; that she did not render her services as promptly as she could and should have done, and that this delay was the immediate cause of the extensive damage to the yacht; that there was no evidence of any skill, courage, or judgment in the service which was given; and that the District Court should have held that there was a presumption against the tug, because it did not call some of the witnesses who were familiar with the facts. The learned District Judge after considering the evidence of many witnesses, most of whom testified in open court, in a carefully considered and able opinion, held that the tug and her crew were in considerable danger, were exposed to a risk such as no prudent, sensible man would care to take without a very strong incentive of either duty or interest, and that, while the time consumed was small, what was done was all that was required, that it was valuable, and that the service was rendered with promptness, skill, and courage. We are not persuaded that he was wrong in any of these matters, and we do not see that, in view of the ample volume of testimony which was produced, the calling of other witnesses would have served any good purpose.

More consideration must be given to the owner's contention that there was error in the finding that the yacht was worth $25,000 before the explosion and fire and $12,500 after the latter had been extinguished. She was built in 1917 at a cost of $42,000. The government took her over for war uses, and in 1919 sold her at auction for $7,800. In the late fall of 1924, or early winter of 1925, she was put in the hands of an agent at Miami for sale. For three months he tried to get a purchaser at $10,000 or more, but failed to do so. In March of 1925, he sold her for $9,000 to the present owner, who insured her for $12,000.

The libelant offered testimony to the effect that to reproduce her new would now cost from $47,000 to $65,000; that in her damaged condition she was worth somewhere between $18,000 and $30,000. The respondent's witnesses valued her after the fire at from $4,000 to $5,000, and an experienced New York yacht broker said that before the fire $10,000 could have been readily obtained for her, and that he thought by a proper sales campaign as much as $12,000 could have been gotten. He supported his opinion by examples of the prices paid for other boats of about the same size and intended to serve the same purpose. It would have cost $12,500 after the fire to restore her to the condition she was in before it. For $5,000 the owner had arranged to have made some, but not all, of the repairs he contemplated. The testimony is not quite clear as to how much more he intended to spend on her, but, although the indications are that it was a substantial sum, it would not have been sufficient to have made her as fine a boat as she was before the accident.

Indeed, the controversy as to her real value in the last analysis grows out of the fact that, for a boat of her size and comfortable cruising radius, she was finished very luxuriously and very expensively. On at least two occasions she was sold for far less than it would have cost to reproduce her, even after allowing liberally for depreciation, simply because nobody could be found who was willing to pay more for her. The learned District Judge thought that these facts proved that there was no real market for her, and that therefore her reproduction cost must play the principal part in fixing her worth for salvage purposes. He found that, if consideration was given to nothing other than

the cost of reproduction and to general and special depreciation, the latter from some dry rot in her timbers, she was worth before the explosion $27,000, but that the evidence as to what she had fetched or would fetch in the market should be given sufficient weight to cut that total down $2,000 or to $25,000.

[1] It may be that, in appraising property for salvage purposes, the salvor is entitled to have it valued at the most it is worth to its owner. If it is something which is freely bought and sold, that value will be what it will bring in the market, less whatever it may reasonably cost the owner to put it in marketable condition. There may, moreover, be circumstances under which it cannot be sold at all, or in which anything to serve its owner's purpose cannot be found in the market, and yet it is really valuable to him, either for its earning capacity or for the pleasure he gets out of it. If so, the worth of that which the salvor saved for him must be determined in some other way than by inquiring what somebody else will pay for it. If its value lies in its earning capacity, it should be appraised accordingly, unless it could be reproduced for a smaller sum, after due allowance had been made for the time lost during such reproduction. If it is earning on a higher capitalization than its reproduction cost with such allowance, or if it is kept for the pleasure of its owner, is something which he cannot replace except by having its duplicate built, and which he will have built, if he cannot obtain it otherwise, the salvor is entitled to have its value calculated on its reproduction cost, with proper allowance for general and special depreciation and ascertainable damage.

Suppose, however, the facts are that the boat saved is kept for pleasure only. It earns nothing. It originally cost a great deal to build, and would now cost as much or more to reproduce. Its original owner spent much upon it, because he was able and willing to get for himself a boat which suited his taste and his fancy, and met his own perhaps exacting ideas of what comfort required. For one reason or another, it passed from his ownership. Its subsequent owner wished to sell it. Few persons wanted it at any price, and none was willing to pay more than a fraction of the cost of rebuilding. There was much in it which no one other than the first owner required, and for which none other was willing, or perhaps considered himself able, to pay. It is exposed to danger, from which salvors rescue it. Is their reward to be calculated on what it was once worth to one man, even

though that is no more or perhaps not even so much as it would be now worth to him or to another of like tastes and with as well-filled a purse, in the absence of all evidence that such a one can be found? Some one may build a palace in a neighborhood in which nobody else who can afford to pay for such a residence wishes to live. Its existence may actually depreciate the selling value of the farm, plantation, or estate upon which it stands. It actually is bought for little, by some one who enjoys its splendor and its comforts, and who can and is willing to invest in it the modest sum he has paid for it, which is as much or more than any one else will give. If the law of salvage prevailed upon dry land, and some one put out a fire in it, would any one suppose that the reward of the salvor should be figured upon the cost of reproducing it?

When the public demands that the property of a utility shall be put to its use, it must in any compulsory fixing of rates see that they shall compensate its owners for what it is worth to them. There is nothing unfair in saying that its value shall be taken to be not less than it would cost to get the service it demands in the only other way in which the equivalent of it could be obtained; that is, by constructing a plant which would itself be capable of giving what is desired. If one man by negligence or design destroys the property of another, he must put the injured party in the situation in which he was before the wrong was done. If he has sunk his ship, he must give him money enough to enable him to get as good a ship, either by buying another in the market, if that can be done, or, if it cannot, by having one built. Standard Oil Co. v. Southern Pacific, 268 U. S. 146, 45 S. Ct. 465, 69 L. Ed. 890.

[2, 3] In a salvage case, however, the property is valued, not for the purpose of paying its salvor for its partial or total destruction or appropriation, for he never owned any of it, but solely because what it is worth is one of several factors to be considered in fixing his reward. It should not be appraised at more than it is worth to its owner. Ordinarily, that is what he can get for it in the market. If it is not salable, its value will be measured by what it earns for him, or by the value the evidence shows he puts upon the pleasure he gets out of it, not exceeding what it would cost to build another like it. In this as in other salvage cases, it is unnecessary to reach anything more precise than a rough approximation of the worth of the salved property in the

condition in which it was upon the completion of the salvage service. We shall therefore not attempt any further analysis of the evidence as to value. It is sufficient to say that we are convinced that, after the explosion and fire had done their work, the yacht was not worth more than $7,500, if so much, and that a salvage allowance in excess of $1,500 cannot be sustained. Even so, the tug will get more than 60 times as much as would have come to her, had she been directed by the Charleston fire department to do precisely what she did.

It follows that the decree below must be modified, by reducing the award from $2,500 to $1,500. In the District Court the costs will be apportioned as its decree has directed, and in this court they will be paid by the appellee.

Modified.