**ATLANTIS MARINE TOWING, INC., a Florida corporation, Plaintiff,**

v.

**The M/V ELIZABETH, her engines, boats, tackle, apparel, furniture and appurtenances, in rem, Defendant.**

**No. 03–23279–CIV.**

United States District Court, S.D. Florida.

Nov. 18, 2004.

Jeffrey Eric Foreman, Randy Scott Ginsberg, Darren W. Friedman, Kaye Rose & Maltzman, Miami, FL, for Plaintiff.

John David Kallen, North Miami Beach, FL, for Defendant.

## MEMORANDUM OPINION INCORPORATING FINDINGS OF FACT AND CONCLUSIONS OF LAW

TURNOFF, United States Magistrate Judge.

### FACTUAL BACKGROUND AND INCORPORATED FINDINGS OF FACT

Plaintiff Atlantis Marine Towing, Inc. ("AMT"), a Florida Corporation, is a professional maritime towing and salvage company. AMT's business consists of, among other things, assisting boats in distress. AMT is based at Monty's Marina in Coconut Grove. On November 24, 2003, at approximately 3:30 p.m., AMT responded to a VHF radio call indicating that a boat was on fire at Pier Two at Dinner Key

Marina in Miami. AMT boat captain Burt Korpella ("Korpella") and crew member Vincent Morenza ("Morenza") immediately mobilized AMT's boat—Vessel Assist Unit 9 ("Unit 9")—to respond to the fire. Unit 9 is a 28 foot Gulfstream boat with navigational equipment, water pumps, oil containment, and other fire fighting equipment. Korpella manned the helm and Morenza began rigging a water pump and hose to fight the fire. Korpella steered Unit 9 from Monty's Marina to Dinner Key Marina at a high rate of speed. The testimony established that the trip between the two marinas was approximately one to two minutes and that Unit 9 likely arrived at the Elizabeth sometime between 3:32 p.m. and 3:40 p.m. Upon approaching Pier Two at Dinner Key Marina, Korpella and Morenza observed black smoke and fire rising from the port side of Defendant's vessel, the M/V Elizabeth ("Elizabeth"). The Elizabeth is a 70 foot Feadship[1] that the parties stipulated possessed a pre-fire value of 2.5 million dollars.

The Elizabeth was moored with its port side tied to the dock of Pier Two. Unit 9 approached the Elizabeth from its starboard side and maneuvered towards the port side of the stern to immediately begin to fight the fire by spraying water from Unit 9 onto the Elizabeth. As Unit 9 continued to fight the fire, the smoke emanating from the Elizabeth turned from black to gray. Within five to ten minutes after Unit 9 arrived at the Elizabeth, several fire fighting units from the Miami Fire Department ("MFD") began arriving on the scene via land. The MFD does not possess a specific maritime unit to fight boat fires. According to the testimony, the MFD's "Fire Incident Report" (Def.'s Ex. 4), and the MFD's "History of Alarms" report (Def.'s Ex. 12), the first MFD unit

arrived on the scene at 3:45 p.m. The evidence also established that it took a few minutes for the MFD to gather their gear and travel to the Elizabeth which was moored at the end of the Pier Two dock.

The MFD took both independent action and also worked with Unit 9 in order to quell the remaining smoke and to secure the Elizabeth from any additional danger. Testimony indicated that the MFD received additional instruction from Korpella on how to secure the boat in the aftermath of the electrical fire[2] onboard the Elizabeth. Both AMT and the MFD were on the scene for approximately three hours.

The parties appeared before the undersigned for a bench trial to determine whether AMT is entitled to a salvage award, and if so, in what amount.

## Conclusions of Law and Additional Findings of Fact

### I. Salvage Claim

■ To succeed on a claim for salvage, the Plaintiff has the burden of proving the following three elements:

(1) a maritime peril from which the ship or other property could not have been rescued without the salvor's assistance;

(2) a voluntary act by the salvor without a pre-existing contractual, official, or legal duty to render assistance;

(3) success in saving, or helping to save, in whole or in part, the property at risk.

See *Klein v. Unidentified Wrecked and Abandoned Sailing Vessel*, 758 F.2d 1511, 1515 (11th Cir.1985); *Fine v. Rockwood*, 895 F.Supp. 306, 309 (S.D.Fla.1995); *Cobb Coin Co. v. Unidentified Wrecked and Abandoned Sailing Vessel*, 549 F.Supp. 540, 547 (S.D.Fla.1982).

---

1. During testimony a "Feadship" was described as the Rolls Royce of yachts.

2. *See* discussion, *infra*.

■ In the present case, the evidence clearly demonstrated that the Elizabeth was in peril. Fire aboard a vessel is classic marine peril. *See, e.g., Legnos v. M/V Olga Jacob,* 498 F.2d 666, 670 (5th Cir. 1974) (fire aboard a ship is a "classic case of marine peril")[3]; Martin J. Norris, *The Law of Salvage,* § 64, at 101 (1958) ("It is difficult to conceive of a fire aboard ship which does not place that vessel in peril."). The evidence also established that AMT provided significant fire fighting services to the Elizabeth *prior* to the arrival of the MFD. *See, e.g., Southernmost Marine Services, Inc. v. One (1) 2000 Fifty Four Foot (54") Sea Ray Named M/V "Potential",* 250 F.Supp.2d 1367, 1377 (S.D.Fla.2003) ("[A] marine peril exists where a vessel is in danger of being partially or totally lost and where it is not being successfully salved when the plaintiff voluntarily undertakes its salvage operation."). Accordingly, AMT satisfied its burden of proof as to the first element for a valid salvage claim.

As to the second element for a valid salvage claim, the parties do not dispute that AMT rendered voluntary service to the Elizabeth. The evidence at trial demonstrated that AMT acted voluntarily, without any contractual, legal, or official duty to do so. *See, e.g., The Blackwall,* 77 U.S. 1, 11, 10 Wall. 1, 19 L.Ed. 870 (1869) (finding that notwithstanding fire department assistance, "[u]seful services of any kind rendered to a vessel or her cargo, exposed to any impending danger and imminent peril or loss or damage, may entitle those who render services to salvage reward."). Accordingly, AMT satisfied its burden of proof as to the second element for a valid salvage claim.

The parties contentiously dispute, however, whether AMT has sufficiently proven the third prong for a salvage claim: success in saving, or helping to save, in whole or in part, the property at risk. *See Klein v. Unidentified Wrecked and Abandoned Sailing Vessel,* 758 F.2d 1511, 1515 (11th Cir.1985); *Fine v. Rockwood,* 895 F.Supp. 306, 309 (S.D.Fla.1995); *Cobb Coin Co. v. Unidentified Wrecked and Abandoned Sailing Vessel,* 549 F.Supp. 540, 547 (S.D.Fla.1982).

Both Korpella and Morenza testified that they extinguished the fire prior to the arrival of the Miami Fire Department. Their testimony was based on their observations that the visible flames disappeared, and the smoke emanating from the Elizabeth changed color from black to gray after they sprayed the Elizabeth with water. They also testified that, once on the scene, the Miami Fire Department was ill-prepared and ill-equipped to fight a boat fire and to secure the yacht. To this end, Korpella and Morenza testified that the first fireman to arrive at the boat improperly boarded the vessel, fell, injured himself, and had to be helped from the scene. Korpella and Morenza also testified that the MFD improperly ascended to the bridge of the vessel where no fire had been present. Korpella and Morenza further testified that they determined that the fire was an electrical fire and that Korpella had to give instructions to the MFD on how to properly secure the ship in the wake of such a fire. In summary, Korpella and Morenza testified that it was their actions—and not that of the MFD—that resulted in the fire being extinguished. While Morenza and Korpella—and indeed salvors in general—have a financial motive to embellish the peril and damage sustained by a ship when claiming salvage,

3. The United States Court of Appeals for the Eleventh Circuit has adopted as binding precedent all decisions rendered by the former Fifth Circuit prior to October 1, 1981. *See Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981).

their testimony was substantively consistent.

Dave Mendelson, a former police officer who resides on a boat at Dinner Key Marina, also testified, but testified to a much different view of the events. Mendelson's boat was docked at Pier Three, just south of where the Elizabeth was docked at Pier Two. From this vantage point Mendelson observed that the Elizabeth was on fire from its port side. Mendelson called 911 to report the fire on the Elizabeth. He also observed the fire fighting efforts of Unit 9 and the MFD. The 911 call placed by Mendelson—which was replayed in court—clearly established the seriousness of the fire and the urgent need for an immediate response. Mendelson testified that Unit 9 and the MFD arrived at the Elizabeth simultaneously. Mendelson further testified that Unit 9 never sprayed water on the port side of the Elizabeth. Mendelson concluded that Unit 9 did absolutely nothing to put out the fire on the Elizabeth and that the MFD was solely responsible for saving the Elizabeth. Mendelson also testified that he believed AMT was attempting to sink the Elizabeth and it would be improper for AMT to receive a salvage award. While the testimony of a third-party observer might normally be given higher credibility than that of an interested party, Mendelson's testimony suggested that he either held animosity for AMT or salvors generally.

Bruce Oestreich, a 24 year veteran of the Miami Fire Department and fire captain for the past twelve years, testified that he responded to the fire with three other crew members. Oestreich testified that he received a call to respond at 3:41 p.m. and arrived on the scene at 3:45 p.m. Oestreich also testified that additional units responded to the fire. Oestreich testified that he observed dark gray smoke emanating from the Elizabeth, but did not observe flames. Oestreich concluded that the fire started near the microwave in the Elizabeth's galley on the port side of the yacht. Oestreich further testified that he did not observe AMT spraying water on the port side of the Elizabeth near the galley. Oestreich testified, rather, that he observed AMT improperly directing its water hoses toward a ventilation shaft on the boat that may have lead to the vessel's engine room.

Michael Kirk, a 21 year old student who resides at Dinner Key Marina testified that he watched the events unfold from approximately 60 feet away from the Elizabeth. Kirk testified that Unit 9 was the first to respond to the fire on the Elizabeth. Kirk also testified that for approximately three to five minutes Unit 9 sprayed water directly at a port side window where Kirk observed flames. Kirk further testified that he saw the flames extinguished as a result of Unit 9's efforts and that the color of the smoke emanating from the Elizabeth thereafter changed from black to light gray. Kirk also testified that he observed the arrival of the MFD and that the first firefighter to board the yacht slipped and fell, thus requiring help from others. Kirk additionally testified that the MFD ascended to the fly bridge of the Elizabeth, but was unsure why given that the fire was in the yacht's galley.

█ Based on all of the evidence, the court concludes that the Plaintiff has met its burden of proof as to the third element of a valid salvage claim: that AMT and Unit 9 were successful in saving, or helping to save, in whole or in part, the Elizabeth. This Court does not doubt that Korpella and Morenza—like all salvors—possess financial incentive to embellish their claims of salvage. However, their testimony was substantively consistent. The testimony of third-party ob-

server Mendelson was not consistent with the evidence and the testimony of other witnesses. The evidence disproves Mendelson's claim that Unit 9 and the MFD arrived simultaneously. The evidence also suggested Mendelson harbored animosity towards AMT or salvors generally. Captain Bruce Oestreich's testimony was significant. While he testified that he did not believe AMT did anything to directly extinguish the fire, Oestreich also testified that upon the MFD's arrival, he observed no visible flames.[4] Oestreich's testimony, therefore, is consistent with the evidence that AMT successfully fought the fire prior to the arrival of the MFD. The testimony of third-party observer Michael Kirk was particularly compelling. Kirk does not have a personal relationship with the parties nor does he possess a financial interest in the outcome of the case. Kirk's testimony bolstered the evidence that AMT's efforts helped save the Elizabeth.

Accordingly, this Court finds that based on the totality of the evidence, AMT and Unit 9 were successful in saving, in whole or in part, the Elizabeth. This Court finds that the evidence demonstrated that the smoke emanating from the Elizabeth changed from black to gray prior to the arrival of the MFD. It is uncontroverted that the change in smoke color is compelling evidence that Unit 9's fire fighting efforts were successful. The Court also finds that the evidence indicates that Unit 9 arrived at the Elizabeth at least five to ten minutes prior to the MFD, and that Unit 9 immediately began spraying the Elizabeth with water. Where the Elizabeth was clearly on fire and there existed a risk of explosion (which, in turn, could have caused severe damage to the dock

and other boats moored adjacent to the Elizabeth), Unit 9's speedy arrival minimized the ultimate damage to the Elizabeth and prevented what could have been a much greater catastrophe had fire fighting efforts commenced only upon the arrival of the MFD. Therefore, this Court concludes that Plaintiff has met its burden of proof for a valid claim of salvage.

## II. SALVAGE AWARD

This Court, having concluded that Plaintiff has a valid claim for salvage, must also determine the appropriate salvage award. "The award on an action for salvage—unknown for land activities—is not one of *quantum meruit* as compensation for work performed, but is a bounty historically given in the interests of public policy, to encourage the humanitarian rescue of life and property at sea, and to promote maritime commerce." *Ocean Services Towing and Salvage, Inc. v. Brown*, 810 F.Supp. 1258, 1262 (S.D.Fla.1993) (citations omitted). The fact that AMT likely had pecuniary motivations for rendering assistance to the Elizabeth is immaterial. AMT is entitled to a salvage award as long as the three elements for a valid salvage claim have been proven. *See id.*

### A. ANALYSIS

■ There is no fixed rule for determining the amount of the salvage award, nor is the award necessarily based on comparison to other awards or percentages. *See, e.g., B.V. Bureau Wijsmuller v. United States*, 702 F.2d 333, 339 (2d Cir.1983). Rather, admiralty courts have established numerous elements the court should consider and balance when determining the amount of the salvage award. These elements are as follows:

---

**4.** Miami Fire Department Chief Fire Officer Norberto Marti—whose deposition was submitted as Defendant's Exhibit 8, testified similarly. Marti also testified during his deposition that AMT assisted the MFD in securing the boat.

(1) The labor expended by the salvors in rendering the salvage service;

(2) the promptitude, skill, and energy displayed in rendering the service and saving the property;

(3) the value of the property employed by the salvors in rendering the service and the danger to which such property was exposed;

(4) the risk incurred by the salvors in securing the property from the impending peril;

(5) the value of the property saved; and

(6) the degree of danger from which the property was rescued.

*Southernmost Marine Services, Inc. v. One (1) 2000 Fifty Four Foot (54″) Sea Ray named M/V "Potential",* 250 F.Supp.2d 1367, 1377–78 (S.D.Fla.2003); *see also Treasure Salvors, Inc. v. The Unidentified, Wrecked and Abandoned Sailing Vessel,* 556 F.Supp. 1319, 1340 (S.D.Fla.1983); *The Blackwall,* 77 U.S. 1, 14, 10 Wall. 1, 19 L.Ed. 870 (1869).

### 1. Labor Expended by the Salvors in Rendering the Salvage Service

AMT arrived at the Elizabeth five to ten minutes prior to the MFD and remained on the scene for approximately three hours. AMT continued to assist the MFD once the fire department was on the scene. AMT provided helpful instruction to the MFD on how to properly secure the boat in the wake of the electrical fire.

### 2. Promptitude, Skill, and Energy Displayed in Rendering the Service and Saving the Property

AMT promptly arrived on the scene within minutes of hearing the VHF radio call. AMT is a professional salvor and Unit 9 was properly equipped to fight boat fires. The evidence further demonstrated

that AMT—albeit motivated by pecuniary gain—was exceptionally energetic in fighting the fire and securing the safety of the Elizabeth.

### 3. Value of the Property Employed by the Salvors in Rendering the Service and the Danger to which such Property was Exposed

AMT's Unit 9 is a 28 foot Gulfstream boat with navigational equipment, water pumps, oil containment, and other fire fighting equipment. Burt Korpella testified that the Gulfstream is a $65,000 boat, with nearly $100,000 in total value with its equipment. AMT also released disposable oil containment pads into the water surrounding the Elizabeth. The evidence, however, does not conclusively establish that the Elizabeth was leaking oil nor that the release of the oil pads was necessary. Unit 9 and its equipment were exposed to the dangers inherent in fighting fires.

### 4. Risk Incurred by the Salvors in Securing the Property from the Impending Peril

Mendelson's 911 call evidences the danger to the Elizabeth and the surrounding dock and moored boats. Mendelson yelled at Unit 9 to stay away from the burning boat. Korpella and Morenza did not heed Mendelson's warnings, and the two were exposed to the dangers inherent in fighting fires.

### 5. Value of the Property Saved

The parties stipulated that the Elizabeth had a pre-fire value of 2.5 million dollars.

Noel Aguilera, owner of the Elizabeth, testified that today it would cost more than ten million dollars to replace the Elizabeth, building a new ship, ground up.[5]

---

**5.** The Elizabeth was originally built in 1988.

James Thomas McCrory, a marine surveyor, was called by the defense. McCrory testified that he has been involved in the marine industry for 40 years, has been a surveyor since 1976, and investigated the casualty at the request of an insurer. McCrory testified that he visited the Elizabeth at least ten times since December 2003. McCrory testified that he also negotiated Elizabeth's repair costs down to roughly 1.28 million dollars from a previous 1.48 million dollar rough estimate. McCrory additionally testified that he originally estimated the post-casualty value of the Elizabeth to be $650,000, but that he since amended that figure to approximately $300,000. McCrory testified that he was able to determine that the source of the flames was the microwave in the Elizabeth's galley. McCrory testified that, during the course of the fire, a duct burned away which resulted in smoke rising to the Elizabeth's fly bridge. This testimony helped to explain why the MFD may have initially ascended to the fly bridge of the Elizabeth to fight the fire located in the galley below. McCrory also testified that, based on his surveys of the Elizabeth, Unit 9 did nothing to put out the fire. McCrory's testimony, however, was problematic in several respects. First, his conclusions regarding Unit 9's involvement in initially extinguishing the fire were not based on eyewitness testimony, but rather his post-fire evaluation. Second, McCrory was retained by an insurance company that has financial incentive to devalue the Elizabeth.

Stuart Korpella, owner and operator of Atlantis Marine Towing and father of Burt Korpella, also testified regarding the value of the Elizabeth. Stuart Korpella's valuation was based on his familiarity with the Elizabeth (he was on the scene during the fire although he did not take an active role in fighting the fire) and his experience in boating since 1968. Stuart Korpella testified, in substance, that McCrory undervalued the post-casualty value of the Elizabeth. Korpella testified that the unrepaired value of the Elizabeth was over one million dollars. Korpella reached this conclusion based, in part, on what he testified to be the significant value of the undamaged mechanical components of the vessel—such as the motors, desalination plant, propellers, bow thrusters, generators, and other such components.

"The value of the salved boat is only one of the factors to be considered in fixing a salvage award. Indeed, it should not be the principal guide for determining the award, but should be merely a factor to be considered along with others." *See Ocean Services Towing and Salvage, Inc. v. Brown,* 810 F.Supp. 1258, 1263 (S.D.Fla. 1993) (*citing The New Camelia,* 105 F. 637, 640–41 (5th Cir.1900)). "The salved value is the post-casualty value of the property, in her damaged state, at the time of the salvage or after the vessel is brought into safe harbor." *Id.* (*citing Beach Salvage Corp. of Florida v. the Cap't Tom,* 201 F.Supp. 479, 483 (S.D.Fla. 1961); 3A Martin J. Norris, *Benedict on Admiralty* § 259 (1992)).

■ Normally, the salved value would be the fair market value of the property. *Id.* However, in the present case, the fair market value of the post-casualty property was not clearly established.[6] Accordingly, "[u]se of a pre-casualty book value for the boat and subtracting repair costs is a permissible method where there is no established market value for a vessel." *Id.* (*citing San Francisco Bar Pilots v. Vessel*

---

6. For example, the fair market value of a post-casualty vessel can be established via the actual sale of the vessel in a commercially reasonable manner. *Id.* The Elizabeth has not been sold.

*Peacock,* 733 F.2d 680, 682 (9th Cir.1984); *Rand v. Lockwood,* 16 F.2d 757 (4th Cir. 1927)). According to this method of post-casualty valuation, the Elizabeth's salved value would be roughly 1.22 million dollars.[7]

"The salved value generally serves as a ceiling for the maximum allowable total award." *Id.* at 1264 (*citing Allseas Maritime, S.A. v. M/V Mimosa,* 812 F.2d 243, 247 (5th Cir.1987) *reh'g denied,* 820 F.2d 129 (5th Cir.1987); *Platoro Ltd., Inc. v. Unidentified Remains of a Vessel, Her Cargo, Apparel, Tackle, and Furniture, in a Cause of Salvage, Civil and Maritime,* 695 F.2d 893, 904 (5th Cir.1983)). Yet, generally, "the award will never be for more than half the value of the property .... [and] except where the property saved is of trifling value, the award of anywhere near 50% would be exceptional." Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty,* § 8–10, at 563 (2d ed.1975); *see also* Martin J. Norris, *The Law of Salvage,* § 243, at 383 (1958) ("Generally an award of more than fifty percent, or a moiety, is rarely allowed. In fact, an award of more than fifty percent of the value of the saved property in these days of large values is exceptional."). Furthermore, where large values are involved, an award of more than approximately twenty percent is rare. See Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty,* § 8–10, at 563 (2d ed.1975).

Given the testimony and other evidence adduced at trial, the Court is left to consider an array of financial figures and conflicting evidence regarding the value of the property saved. The parties stipulated that the Elizabeth (originally built in 1988) had a pre-fire value of 2.5 million dollars. The owner of the Elizabeth testified that today it would cost more than ten million dollars to build the Elizabeth from ground up. Stuart Korpella testified that the Elizabeth's post-casualty value was over one million dollars. McCrory testified that an original 1.48 million dollar rough estimate to repair the Elizabeth was negotiated down to roughly 1.28 million dollars. McCrory also testified that he originally estimated that the Elizabeth's post-casualty value was $650,000, but had more recently determined the post-casualty value to be approximately $300,000. Both Stuart Korpella and James McCrory's post-casualty estimates must be viewed with a critical eye given their financial interests in the case. Yet a separate method for the fair market valuation of the Elizabeth based on the difference between the yacht's pre-fire value and post-fire repair costs places the Elizabeth's post-casualty value at approximately 1.22 million dollars.

Accordingly, given all of the evidence, the case law discussed above, and the absence of a conclusive and precise method for determining the post-casualty value of the Elizabeth, this Court concludes that— at a minimum—McCrory's original post-casualty estimate of $650,000 is a far more accurate projection of the Elizabeth's post-casualty value than McCrory's later estimate of $300,000. The Court further notes, without reaching a definitive conclusion, that the evidence suggests that the

7. This figure would be based on the Elizabeth's stipulated pre-fire value of 2.5 million dollars and subtracting the negotiated repair estimate of roughly 1.28 million dollars. This Court is mindful that the repair estimates provided by the shipyard are rough estimates that are subject to fluctuation. Indeed, should the repairs ultimately be performed over the negotiated estimate, the post-casualty value of the Elizabeth would decline under this formula for post-casualty valuation. Of course, the converse is true as well. That is, should the repair costs fall under budget (or are subject to additional downward negotiations), the post-casualty value of the Elizabeth would increase under this formula.

post-casualty value of the Elizabeth could be over one million dollars.

### 6. *Degree of Danger from which the Property was Rescued*

The danger to the Elizabeth was significant. While some testimony on behalf of AMT suggested that the Elizabeth began to · sink, the Court is not so convinced. What is clear, however, is that the damage from the fire resulted in the Elizabeth losing a significant amount of value. Had the fire been permitted to burn until the arrival of the MFD, the damage to the Elizabeth could have been catastrophic. "A non-friendly fire aboard ship so long as it remains unextinguished is a classic case of marine peril. With flammable materials almost everywhere, passages and spaces where natural convection readily permits a small smoldering to break out in blazing fury, the history of the sea attests to fire as a cause of some of the most catastrophic of marine disasters." *Legnos v. M/V Olga Jacob*, 498 F.2d 666, 670 (5th Cir.1974). Ship fires are therefore "rightfully regarded as one of the most dangerous positions in which a vessel can be found. But a salvage award is made on the basis of the danger existing at the time that the salvage service is rendered and not on the speculative destructiveness of fire if aid had been withheld." Martin J. Norris, *The Law of Salvage*, § 256, at 398 (1958).

In *Straits of Gibraltar*, 32 F. 297 (D.N.J. 1887), the district court considered a salvage case where both the salvors and the fire department arrived on the scene of a boat fire occurring near the Inman pier in Jersey City. The Straights of Gibraltar, a steamship, was unloading cargo into a lighter [8] that caught fire. Two tug boats pulled the burning lighter away from the Straights of Gibraltar. The lighter was ultimately consumed by the fire and sank, but the Straits of Gibraltar was saved. The district court, in awarding a salvage award upon the salving of the Straights of Gibraltar, observed that:

> [i]t is true that the fire department of Jersey City came on the pier at which the steamer [Straights of Gibraltar] was moored, before the lighter was removed, and most probably would have prevented a total loss, or even any very extensive injury to the ship or cargo; also that several other tugs had come to the rescue, and were lying off the dock, ready to give needed assistance; but these facts should not detract from the merit which is due to the libelants for their conduct in braving the actual danger which they encountered in hauling out the lighter. It is also true that a very brief time elapsed from the moment the alarm was given until all danger to the ship was over,—perhaps not more than 35 to 45 minutes; but the alacrity and speed with which the work was performed should increase its value, as each minute of delay would have only added to the peril and injury of the steamer.

*Id.* at 298–99.

The evidence establishes that the Elizabeth benefited from the services of AMT, a professional salvor. AMT possessed the necessary equipment to fight boat fires and instructed and assisted the MFD on securing the yacht from further damage.

### B. CONCLUSION

█ As indicated above, the Court is mindful that there is no precise mathematical formula to determine the amount of a proper salvage award. Each case must be

---

8. A "lighter" is a large barge (usually with a flat bottom) that is typically used for loading and unloading ship cargo.

decided on its unique facts. In the present case, the Court has carefully considered all of the testimony and other evidence offered by the respective parties and has considered and applied all of the necessary factors in order to determine the amount of a fair and appropriate salvage award under the facts of this case. Accordingly, based on all of the above, the Court concludes that AMT is entitled to a salvage award in the amount of $150,000.00.[9]

### III. ATTORNEYS' FEES AND COSTS

■ Plaintiff additionally seeks an award of attorneys' fees and costs in connection with this litigation. While an "award of attorneys' fees and costs in admiralty is discretionary and specifically permitted in salvage cases," *Treasure Salvors, Inc. v. The Unidentified, Wrecked and Abandoned Sailing Vessel*, 556 F.Supp. 1319, 1341 (S.D.Fla.1983) (citing *Compania Galeana v. M/V Caribbean*, 565 F.2d 358 (5th Cir.1978); *Cobb Coin Co. v. Unidentified, Wrecked and Abandoned Sailing Vessel*, 549 F.Supp. 540 (S.D.Fla. 1982)), it is clearly not appropriate in this case. In *Compania Galeana* and *Cobb Coin Co.*, relied upon by both Plaintiff AMT and the district court in *Treasure Salvors, Inc.*, attorneys' fees were awarded based upon a finding of bad faith by the nonprevailing party. "In admiralty cases, however, it is the general rule that attorneys' fees are not awarded .... [A]n exception to the rule [is] that attorneys' fees may be awarded where the nonprevailing party has acted in bad faith." *Platoro Ltd., Inc. v. Unidentified Remains of a*

*Vessel, Her Cargo, Apparel, Tackle, and Furniture, in a Cause of Salvage, Civil and Maritime*, 695 F.2d 893, 905–06 (5th Cir.1983) (citing *Noritake Co. v. M/V Hellenic Champion*, 627 F.2d 724 (5th Cir. 1980)). The Defendant has not acted in bad faith in this action. The case law cited by Plaintiff in support of its request for attorneys' fees and costs is therefore inapposite. Accordingly, this Court declines to award attorneys' fees and costs to the Plaintiff.

---

9. In pretrial briefing on the issue of damages. Plaintiff argued for a total award in the amount of $500,000, representing a $400,000 salvage award and a $100,000 "equitable uplift" because AMT is a professional salvor (as opposed to a "chance salvor"). (DE 37 at 8). Defendant argued for an award in the amount of $675 based on a theory of *quantum meruit* representing AMT's time and labor in fighting the fire (DE 68 at 6), or alternatively, a salvage award not exceeding $5,000 (DE 69 at 6). The Court declines to award AMT a specific "equitable uplift" for its professional services. However, the Court did consider AMT's skill and expertise when calculating the final salvage award.